# In the United States Court of Federal Claims

No. 10-192T

(Filed: September 20, 2013)

```
************************************  *
                                      *
SALEM FINANCIAL, INC.,                *   Tax Refund Suit; STARS Structured
                                      *   Transaction Between BB&T Bank and
                   Plaintiff,         *   Barclays Bank; Availability of Foreign
                                      *   Tax Credits From Payment of United
v.                                    *   Kingdom Taxes; Deductions for Interest
                                      *   and  Transaction  Costs;  Economic
UNITED STATES,                        *   Substance Doctrine Applied to Trust
                                      *   and Loan Components of Transaction;
                   Defendant.         *   Assessment of Penalties.
                                      *
************************************  *
```

*Rajiv Madan*, with whom were *John B. Magee*, *Christopher P. Bowers*, *Christopher P. Murphy*, *Royce Tidwell*, *Nathan P. Wacker*, and *Nicholas L. Wilkins*, Bingham McCutchen LLP, Washington, D.C., and *James C. McGrath* and *Deana K. El-Mallawany*, Bingham McCutchen LLP, Boston, Massachusetts, for Plaintiff.

*Dennis M. Donohue*, with whom were *John L. Shoenecker*, *Raagnee Beri*, *Kari M. Larson*, and *William E. Farrior*, Trial Attorneys, and *Alan S. Kline*, Special Attorney, Tax Division, U.S. Department of Justice, Washington, D.C., for Defendant.

<u>OPINION AND ORDER</u>

WHEELER, Judge.

In this tax refund case, the Court must determine the proper tax treatment for an unusually complex financial transaction known as STARS ("Structured Trust Advantaged Repackaged Securities"). Plaintiff, Salem Financial, Inc. ("Salem"), is a subsidiary of BB&T Corporation, a bank chartered under the laws of North Carolina. Although many entities were involved in the STARS transaction, the real parties in interest were BB&T Bank and Barclays Bank PLC, which is headquartered in the United Kingdom ("U.K."). The other entities were created or became involved to serve some special purpose for the transaction.

The BB&T STARS transaction was in effect for nearly five years, from August 1, 2002 through April 5, 2007.  The purpose of the STARS transaction was to generate large-scale foreign tax credits for a U.S. taxpayer, which could be used to enhance revenue and reduce taxes in the United States.  The amount at issue in this case, including the potential assessment of taxpayer penalties, is $772,144,153.45.  This amount is comprised of the following: disallowed foreign tax credits ($498,161,951); disallowed interest deductions ($74,551,947.40); the tax paid on "Bx" payments from Barclays to BB&T ($84,033,228.20); disallowed transaction cost deductions ($2,630,125.05); and penalties ($112,766,901.80).

The complexities of the STARS transaction, including the concept of a Bx payment, will become apparent below.  Stripped to its essence, however, STARS called for the U.S. taxpayer, in this case BB&T, to establish a trust containing approximately $6 billion in revenue-producing bank assets.  The monthly revenue from the trust was then cycled through a U.K. trustee, an act that served as a basis for U.K. taxation.  Although the revenue was immediately returned to BB&T's trust, the assessment of U.K. taxes generated U.K. tax credits that were shared 50/50 between Barclays and BB&T.  A $1.5 billion loan from Barclays to BB&T also was part of the structured transaction, although the loan was not necessary to the objective of generating foreign tax credits.  The Barclays monthly Bx payment to BB&T represented BB&T's share of the tax credits, and had the effect of reducing the interest cost of BB&T's loan.  The main question presented is whether the STARS transaction had any purpose other than to generate tax savings, and if not, whether penalties should be assessed against BB&T.[1]

The parties provided a STARS tax tutorial presentation to the Court on February 13, 2013 before the trial began.  The Court held 21 days of trial in Washington, D.C. from March 4 through April 2, 2013.  During the trial, the Court heard the testimony of 26 witnesses, of which thirteen were experts.  The Court admitted deposition excerpts for eleven additional witnesses, principally from those persons who reside outside the United States or where the parties agreed that a deposition could substitute for relatively brief testimony.  The Court received in evidence approximately 1,250 exhibits during the trial.  The parties submitted post-trial findings of fact and memoranda of law on June 7, 2013, and post-trial reply briefs on July 3, 2013.  The Court heard closing arguments on July 30, 2013.

There are different ways of looking at the BB&T STARS transaction, and the Court has wrestled with the question of how best to analyze its various components.  The STARS trust component, where BB&T revenue momentarily is cycled through a U.K.

---

[1] The acronym "STARS" is not particularly descriptive of the transaction at issue.  There is no indication of a loan in the acronym and there are no "repackaged securities" in the transaction.  The evidence suggests that the concept of STARS began as something different, and only grew to include a loan when marketed to banks in the United States.

trustee to create U.K. taxes and foreign tax credits, and then is returned to BB&T, quite clearly is an abusive tax avoidance scheme. The trust creates a series of instantaneous circular cash flows starting and ending with BB&T where no economic activity has occurred abroad to justify the assessment of a U.K. tax. While inarguably sophisticated and creative, the trust purely and simply is a sham transaction accomplishing nothing more than a redirection of cash flows that should have gone to the U.S. Treasury, but instead are shared among BB&T, Barclays, and the U.K. Treasury. The Court finds that the trust component of STARS lacks economic substance.

However, the Court must consider whether the existence of Barclays' $1.5 billion loan to BB&T at favorable interest rates somehow provides the necessary economic substance to salvage the STARS transaction. In analyzing this question, the Court notes that the loan interest rate actually is higher than normal for BB&T until the Barclays' rebate of U.K. taxes through the Bx payment comes into play. The Barclays' Bx payment each month from the sham trust transaction creates the unusually attractive interest rates. Without the Bx payments, the Court is persuaded that BB&T would not have entered into the STARS transaction. The loan transaction thus is substantially influenced by the payments from the sham trust. The loan lacks economic reality where the interest rate is so low that for nearly the first three years of the transaction, Barclays, the lender, makes Bx payments to BB&T, the borrower, exceeding by millions the interest payments due from BB&T to Barclays. An arrangement where a *lender* makes payments to a *borrower* for the first three years of a loan surely would raise the eyebrows of even an experienced financier.

Regardless of whether the Court views the trust and the loan separately or together as one integrated STARS transaction, the Court concludes that the entire arrangement must be disregarded for lack of economic substance. Among the most telling evidence at trial was the revelation that the amount of the loan was unrelated to the amount of the Bx payments. That is, in the relevant formulas created for the STARS transaction, a change in the loan amount does not have any effect on the Bx payment amount. Thus, rather than being intricately linked together with the trust, the loan serves only to add a hoped-for business purpose to the tax avoidance scheme. The Court cannot find economic substance in a loan transaction that is so heavily driven by Bx payments from the sham trust.

For reasons that will be explained, the Court also finds that BB&T is liable for tax penalties for its participation in the STARS transaction. The conduct of those persons from BB&T, Barclays, KPMG, and the Sidley Austin law firm who were involved in this and other transactions was nothing short of reprehensible. Perhaps the business environment at the time was "everyone else is doing it, why don't we?" Perhaps some of those who participated simply were following direction from others. Nevertheless, the professionals involved should have known better than to follow the STARS path, rife with its conflicts of interest, questionable pro forma legal and accounting opinions, and a

taxpayer with a seemingly insatiable appetite for tax avoidance.  One of Defendant's experts, Dr. Michael Cragg, aptly stated that "enormous ingenuity was focused on reducing U.S. tax revenues."  Cragg, Tr. 4687.   After wading through the intricacies of the STARS transaction, the Court shares Dr. Cragg's view that "[t]he human effort, the amount of creativity and overall effort that was put into this transaction . . . is a waste of human potential."  Id.

I.     Findings of Fact[2]

    A.  Entities Involved in the BB&T STARS Transaction

       There are five business entities that each played an important role in this STARS transaction:   (1) BB&T, which established controlled subsidiaries to achieve certain transaction-related objectives; (2) Barclays PLC, which developed the concept of STARS and served as a counterparty in the STARS structure; (3) KPMG LLP, an international accounting firm that assisted Barclays in marketing STARS in the United States, and provided tax opinions to BB&T and other U.S. banks who chose to participate; (4) Sidley Austin Brown & Wood LLP, a law firm which supplied tax opinions and legal services in connection with STARS; and (5) PricewaterhouseCoopers LLP ("PwC"), an international accounting firm that served as BB&T's outside auditing firm beginning in 2002 and examined the STARS transaction at BB&T's request.  The Court will briefly describe the role of each of these entities below.

       1.  BB&T

       Branch Banking & Trust Corporation ("BB&T") is a financial holding company headquartered in Winston-Salem, North Carolina and incorporated in the State of North Carolina.   Stip. ¶ 1.   BB&T conducted business primarily through its banking subsidiaries, which during 2002 through 2007 included offices in North Carolina, South Carolina, Virginia, Maryland, Georgia, West Virginia, Tennessee, Kentucky, Alabama, Florida, and Washington, D.C.  JX 209 at 358414.  The largest subsidiary of BB&T is Branch Banking and Trust Company ("BB&T Bank"), a state bank chartered under North Carolina law.  Stip. ¶ 3; JX 209 at 358414.  BB&T is the oldest bank headquartered in North Carolina, having been chartered in 1872.   BB&T Corporation has two other banking subsidiaries:   (1) Branch Banking and Trust Company of South Carolina ("BB&T-SC"), headquartered in Greenville, South Carolina; and (2) Branch Banking and Trust Company of Virginia ("BB&T-VA"), headquartered in Richmond, Virginia.  JX 209 at 358414.

---

[2]   In this opinion, the Court will cite to the evidentiary record as follows:  February 8, 2013 Joint Stipulations – Stip. ¶ __; Trial Testimony – Witness name, Tr. page; Joint Exhibits – JX __ at page; Plaintiff's Exhibits – PX __ at page; Defendant's Exhibits __ USX __ at page; Deposition Transcripts – Witness name, Dep. Tr. page; Demonstrative Exhibits – Demo. Ex. __.

As of December 31, 2002, BB&T Bank operated 335 branches, and was the second largest bank in North Carolina measured by deposit market share.  Id. at 358415. BB&T-SC operated 94 branches and was the third largest bank in South Carolina measured by deposit market share.  Id.  BB&T-VA operated 241 branches, and was the fourth largest bank in Virginia measured by deposit market share.  Id.  BB&T Bank's principal subsidiaries include:  BB&T Leasing Corp., based in Charlotte, North Carolina, which provides lease financing to commercial businesses; BB&T Investment Services, Inc., also located in Charlotte, which offers non-deposit investment services including annuities, mutual funds and discount brokerage services; BB&T Insurance Services, Inc., headquartered in Raleigh, North Carolina, a retail insurance broker offering property and casualty, life and other insurance products through 71 agencies in eight states; and Stanley, Hunt, DuPree & Rhine, Inc., headquartered in Greensboro, North Carolina and Greenville, South Carolina, which offers group medical plans, insurance and investment consulting, and actuarial services.  Id.

From 1987 to 2002, BB&T acquired 56 community banks and thrifts, 60 insurance agencies, and 21 non-bank financial services providers.  Id. at 358418.  During 1995, BB&T merged with Southern National Corporation, and retained the BB&T corporate name for the merged entity.  The transaction was described as a "merger of equals" because each entity had assets of approximately $10 billion immediately prior to the merger.  Through this combination, the assets of the merged entity doubled.  Johnson, Tr. 59; Goodrich, Tr. 383-84.

As a financial holding company, BB&T is subject to regulation under the Bank Holding Company Act of 1956, as amended, and the examination and reporting requirements of the Board of Governors of the Federal Reserve Board.  JX 209 at 358427.  As state-chartered commercial banks, BB&T Bank, BB&T-SC and BB&T-VA are subject to regulation, supervision, and examination by state bank regulatory authorities in their respective home states.  Stip. ¶¶ 3, 33.  These authorities are the North Carolina Commissioner of Banks, the South Carolina Commissioner of Banking, and the Virginia State Corporation Commission's Bureau of Financial Institutions, respectively. Each of the state chartered banks also is subject to regulation, supervision, and examination by the Federal Deposit Insurance Corporation.  JX 209 at 358427.

The following present or former BB&T officers and employees testified at trial: (1) John Allison, former Chief Executive Officer of BB&T Corporation; (2) John Watson, former Tax Director of BB&T Bank; (3) Donna Goodrich, former Deposits and Corporate Funding Manager of BB&T and current senior executive vice president and member of the executive management team; (4) Hal Johnson, former Corporate Finance Manager of BB&T; (5) Ronald Monger, former overseer of the BB&T Bank Tax Department and  Manager of Shareholder Reporting; (6) Howard Hudson, in-house counsel at BB&T; (7) Ida Marie Hyder, Balance Sheet Risk Manager for BB&T; and (8)

Katherine Coffield, accounting employee responsible for day-to-day operations relating to the STARS transaction.

### 2. Barclays

Barclays Capital is the investment banking division of Barclays Bank PLC. Abrahams Dep., 534-35. The Structured Capital Markets Group of Barclays Capital developed the STARS-type of structured transaction. The Structured Capital Markets Group ("SCM") generally was responsible for executing complex structured transactions. Id. at 16, 535. SCM's objectives were to identify and create value enhancements through accounting, legal, regulatory and tax opportunities, which in some cases involved exploiting differences between tax systems in different countries. Sultan, Dep. 10, 533.

Barclays Capital's structured finance transactions required approval from the SCM Approvals Committee, and were subject to review by two separate credit committees based upon the dollar amount involved. Sultan, Dep. 135-36, 147-48; Abrahams, Dep. 19-20; PX 297 at 204218R. Barclays Capital operated the Barclays Capital Credit Committee ("BCCC") and Barclays Group (consisting of Barclays entities and business units worldwide) operated its own Group Credit Committee ("GCC"), which had ultimate credit authority for Barclays transactions. Abrahams, Dep. 579. When a transaction exceeded a fixed size, it had to be submitted to the BCCC following approval by the SCM Approvals Committee. Sultan, Dep. 147-48. For still larger transactions, BCCC and GCC approvals were required. Sultan, Dep. 150-51, 158-59; Abrahams, Dep. 21. For complex or structured transactions, any submission to the GCC had to include an explanation of the transaction structure. Abrahams, Dep. 92. The BB&T STARS transaction required GCC approval and an extensive review. Id. 601-02.

Each year, Barclays Group engaged in a budgeting process under which the Group's total regulatory capital was allocated among its various business divisions, including Barclays Capital. Id. 32. Barclays Capital in turn allocated regulatory capital among its various business units, including SCM. Id. Each business division was assigned a revenue target and charged with the duty of managing its transactions and consumption of regulatory capital to produce an acceptable overall return. Id. 556. Barclays recently disbanded SCM amid reports that it was a "tax avoidance unit." Peacock, Tr. 2270-71. Former U.K. Chancellor of the Exchequer Nigel Lawson called SCM's business "industrial scale" tax avoidance. Monger, Tr. 1220-23.

The following Barclays personnel provided deposition testimony that the Court admitted into evidence:[3] (1) Iain Abrahams, an employee of the Barclays SCM division responsible for managing risk of the structured transactions; (2) Sohail Sultan, a Barclays SCM division employee involved in the initial conceptualization of STARS and its

---

[3] These witnesses were unavailable to testify at trial because they reside outside of the United States.

development into a viable structure that could be promoted to North American banks as a tax-advantaged financial product; (3) Alkis Ioannidis, a Barclays SCM division employee who worked with Mr. Sultan on structured investments and finance; and (4) David Williams, a Barclays Group Tax Department employee, responsible for overseeing the compliance of Barclays Group with U.K. tax laws.

### 3. KPMG

KPMG is an international accounting firm, providing accounting and tax services to its clients around the world. Beginning in 1999, KPMG partnered with Barclays to promote the STARS structure in the United States, and to explain the mechanics of STARS and its tax benefits to U.S. banks who might be interested in participating. Sultan Dep. 691-92; USX 69, 335. Washington National Tax ("WNT") is an office of KPMG tax professionals in the United States who are organized based upon practice specialty such as corporate tax, partnership tax, and international tax, among others. Wilkerson, Tr. 1636. In 2002, the international tax group in WNT consisted of 30-35 tax professionals. Id. 1640-41. KPMG introduced the STARS transaction to BB&T at a January 17, 2002 meeting, using a slide show presentation to outline the various steps. Monger, Tr. 970; Watson, Tr. 3425; USX 343. Except for some limited audit work that KPMG performed on a BB&T mutual fund, BB&T was not a client of KPMG during 2002-2007. Monger, Tr. 1150.

Robert Wilkerson was the only KPMG witness who testified at trial. Mr. Wilkerson was a principal in the international tax group of the WNT office. David Brockway, the partner in charge of the WNT office, was heavily involved in the development of the STARS concept, and in drafting STARS tax opinions and promotion materials. At the time of trial, Mr. Brockway worked for Plaintiff's law firm, Bingham McCutchen LLP, Wilkerson, Tr. 1865, but he did not testify.

### 4. Sidley Austin Brown & Wood

Sidley & Austin LLP was an international law firm that merged with Brown & Wood in 2001 to become Sidley Austin Brown & Wood LLP. Chapman Tr. 2976, 3177. At all relevant times before the merger, these two firms each maintained a tax department. Id. 2982. Raymond J. Ruble was a partner in Brown & Wood's tax department, and then with Sidley Austin after the merger. USX 85. By 2000, Mr. Ruble had built a significant tax practice based upon developing and promoting tax shelters, which he called "structured tax products." Id. He coordinated much of his work with KPMG, Ernst & Young, Arthur Andersen, and BDO Seidman. Id. Mr. Ruble also developed a relationship with Mr. Sultan of Barclays, with whom he worked to create and promote the STARS transaction. Sultan, Dep. 38, 532. At the suggestion of Barclays and KPMG, BB&T hired Sidley Austin, and specifically Mr. Ruble, to provide a tax opinion for the BB&T STARS transaction. Hudson, Tr. 1518-19, 1545-47; Chapman, Tr.

3062-63; JX 264; USX 436, 617.  Mr. Ruble signed the May 7, 2002 engagement letter where BB&T retained Sidley Austin as legal counsel.  JX 264.  BB&T had not previously used Sidley Austin as its counsel.  Hudson, Tr. 1549.  BB&T received two Sidley Austin opinions for STARS.  The first was a U.S. tax opinion authored by Mr. Ruble.  Id. at 1518-19.  The second was a U.K. tax opinion.  Monger, Tr. 1301-02, 1347-48; JX 287.

Craig Chapman was the only Sidley Austin witness at trial, although the Court accepted the deposition of Graeme Harrower into evidence as an unavailable witness who resides in the U.K.  Mr. Chapman is a partner in Sidley Austin's New York office and is co-head of the global securities practice.  Chapman, Tr. 2974-76.  He advised BB&T on the STARS transaction alongside Mr. Ruble, as well as advising Bank of New York and Sovereign Bank on their respective STARS transactions.  Id. at 2974.  Mr. Chapman, however, is not a tax lawyer.  Id. at 3048.

Mr. Chapman's work on BB&T's STARS transaction began when Barclays contacted Sidley Austin to ask if the law firm would represent BB&T on the transaction.  Chapman, Tr. 3008.  Shortly thereafter, Mr. Ruble and Mr. Chapman traveled to Winston-Salem, North Carolina to meet with BB&T's Ronnie Monger, John Watson, and Howard Hudson to discuss STARS.  Chapman, Tr. 3008-10.  BB&T then retained Sidley Austin as its counsel for STARS.  Id. at 3010.  Mr. Chapman testified that he was the relationship partner with BB&T, but Mr. Ruble signed the engagement letter with BB&T.  Id.; JX 264 at 902.

Sidley Austin issued Mr. Ruble's tax opinion letter on STARS to BB&T on April 4, 2003.  Stip. ¶ 74; PX 174.  In October 2003, Sidley Austin expelled Mr. Ruble from the law firm due to serious irregularities in his tax shelter practice.  Harrower, Dep. 253-54.  BB&T became aware that Mr. Ruble had been terminated from Sidley Austin.  Hudson, Tr. 1598; Watson, Tr. 3553-54.  In November 2003, in hearings before the U.S. Senate's Permanent Subcommittee on Governmental Affairs, and with respect to the Subcommittee's investigation of "U.S. Tax Shelter Industry: the Role of Accountants, Lawyers, and Financial Professionals," Mr. Ruble refused to respond to questions, citing his Fifth Amendment right not to answer.  USX 1526 at 100-01; Wilkerson, Tr. 1849-50.

In August 2005, the United States indicted Mr. Ruble and charged him with tax evasion for "designing, implementing, and marketing fraudulent tax shelters."  United States v. Pfaff, 619 F.3d 172, 173 (2d Cir. 2010).  On December 17, 2008, a jury found Mr. Ruble guilty on ten counts of attempting to evade or defeat U.S. tax laws, and he was sentenced to 78 months of incarceration and two years of supervised release.  He currently is incarcerated in the United States penitentiary in Lewisburg, Pennsylvania.  Defendant deposed Mr. Ruble in this case, but in response to every question after providing his name, Mr. Ruble asserted his Fifth Amendment right not to answer.  Mr. Ruble did not testify at trial.  The STARS transactions were not among the tax shelters at issue in Mr. Ruble's criminal proceedings.

Prior to the start of trial, Plaintiff filed a motion in limine to preclude Defendant from seeking adverse inferences against Plaintiff due to Mr. Ruble's assertion of the Fifth Amendment in response to all questions. Later, after trial, Plaintiff filed a motion to reopen the trial record to obtain Mr. Ruble's substantive testimony in response to written questions previously posed to him in his deposition. On June 13, 2013, the Court issued an order regarding the testimony of Raymond J. Ruble, denying Plaintiff's motion to reopen the trial record, but granting Plaintiff's motion to preclude the application of an adverse inference from Mr. Ruble's assertion of his Fifth Amendment rights. The Court reasoned that Mr. Ruble most likely had asserted the Fifth Amendment for personal reasons, not because of a desire to protect Plaintiff or influence the outcome of this case. See Order, June 13, 2013, Dkt. No. 213.

#### 5. PwC

In March 2002, after terminating Arthur Andersen & Company as its audit firm, BB&T selected the PwC accounting firm to be its new outside auditor. Monger, Tr. 774-75, 1151-53; USX 470. One of PwC's first tasks was to evaluate the STARS transaction, with a specific focus on the STARS tax reserve level. Monger, Tr. 776-77, 1161, 1190. BB&T did not seek a separate legal opinion from PwC regarding the STARS transaction. Monger, Tr. 945-47; JX 259 at 277. Ultimately, PwC arrived at a "less than should" level of comfort that the Internal Revenue Service ("IRS") would accept the STARS transaction, but BB&T nonetheless decided to move ahead with the transaction. Boss, Tr. 2098, 2100-02, 2117-18; USX 951A at 7183-84; JX 256 at 2802; USX 553, 601, 611.

PwC expressed concerns that the STARS transaction did not comply with technical provisions of the Internal Revenue Code. Monger, Tr. 782-85; PX 42; JX 259 at 278-85; USX 529. After PwC had articulated these concerns, Mr. Monger told PwC on April 19, 2002 to focus strictly on the STARS tax reserve issue. Monger, Tr. 1257-58; JX 259 at 277. If the reserve level was too high, STARS would not be profitable to BB&T even on an after-tax basis, and BB&T would not go forward with the transaction. Monger, Tr. 776-77, 1239-43, 1246.

PwC representatives Rich Boss and Chip Harter testified at trial. Mr. Boss was an international tax manager in PwC's Charlotte office, and took the lead in coordinating PwC's national tax group and the audit team. Mr. Harter was an international tax specialist in PwC's Washington, D.C. office, and provided technical assistance on certain STARS issues.

### B. BB&T's Participation in Other Tax Shelters

Aside from the STARS transaction, BB&T has had a number of experiences with other transactions designed to reduce U.S. tax liabilities, some of which ultimately were

disallowed for tax purposes. These transactions include lease-in-lease-out ("LILO") and sale-in-lease-out ("SILO") tax shelters, employed during 1997 through 2001, a structured transaction known as OTHELLO, which KPMG marketed to BB&T in 2002, and Project Knight in 2007, another Barclays structured transaction similar to STARS.

### 1. SILO/LILO

In 1997 through 2001, BB&T entered into many LILO transactions that were later disallowed for tax purposes. PX 68 at 382688. In these transactions, BB&T acquired leasehold interests in two convention centers and various equipment, and entered into operating leases with foreign municipal corporations and entities. Id. BB&T entered into similar SILO transactions that also were disallowed. Monger, Tr. 1269-70; PX 68 at 382688. A key objective of SILOs and LILOs was for the taxpayer to take advantage of depreciation deductions on assets owned by public entities, without assuming any of the ownership risks of these assets. See, e.g., Wells Fargo & Co. v. United States, 91 Fed. Cl. 35 (2010) (denying tax deductions for public transit industry equipment where tax shelter transactions lacked economic substance), aff'd, 641 F.3d 1319 (Fed. Cir. 2011). These SILO and LILO tax shelters involved circular cash flows aimed at reducing taxes, just as the STARS transaction does.

In a February 2002 presentation to BB&T's Board of Directors, the Tax Management team described the benefits of these tax shelters as including deferred income taxes of $635 million through December 31, 2001, and an additional $12.1 million in 2001 earnings. PX 29 at 361386; Monger, Tr. 1046-47. BB&T entered into approximately 37 SILO or LILO transactions between June 1997 and July 2001. Watson, Tr. 3515-16; PX 68 at 382688-89. The cumulative tax loss on the SILO/LILO transactions for 1997 through 2001 was $1.4 billion. The projected losses for 2002, 2003, and 2004 were $343 million, $122 million, and $65 million respectively. PX 68 at 382687; Watson, Tr. 3516.

As of February 2002, the IRS had completed its audit of BB&T's 1996 through 1998 taxable years, and had determined that the SILO/LILO deductions claimed for those years would be disallowed. Monger, Tr. 1047-48; PX 92 at 350335. BB&T was aware that the IRS would be disallowing hundreds of millions of anticipated tax benefits from the ongoing SILO and LILO transactions. Watson, Tr. 2886-87; Monger, Tr. 1049-50; PX 29 at 361392.

BB&T filed a tax refund action in the U.S. District Court for the Middle District of North Carolina challenging the IRS's disallowance of the tax benefits claimed on one of its LILO transactions. On January 4, 2007, the district court granted summary judgment in favor of the United States. BB&T Corp. v. United States, 2007 U.S. Dist. LEXIS 321 (M.D.N.C., Jan. 4, 2007). On appeal, the U.S. Court of Appeals for the Fourth Circuit affirmed the district court's grant of summary judgment. BB&T Corp. v. United States,

523 F.3d 461 (4th Cir. 2008).   BB&T's management quickly understood the adverse impact that these court decisions would have on BB&T's continued participation in LILO and SILO transactions.   Watson, Tr. 3588-89.   BB&T settled its other LILO and SILO disputes after receiving the Fourth Circuit's decision.   Watson, Tr. 3517-18.

## 2.   OTHELLO

In January 2001, before the beginning of the STARS transaction, BB&T began implementing another tax shelter promoted by KPMG called OTHELLO, which reduced BB&T's effective tax rate.   Watson, Tr. 3510, 3530; Monger, Tr. 966; USX 941.   BB&T paid KPMG $4.5 million in fees for carrying out the OTHELLO transaction.   Monger, Tr. 1178; USX 483 at 3.   These fees, however, were linked to the favorable tax consequences that BB&T anticipated from OTHELLO.   A portion of KPMG's fees was deferred until the tax year when OTHELLO closed, or until the IRS examined the transaction.   Monger, Tr. 1181-83; USX 485.   Deferring these fees ensured that KPMG would not be fully compensated until OTHELLO's tax risk had been determined.   Id.   BB&T considered a similar risk-sharing arrangement with KPMG on the STARS transaction, deferring a portion of KPMG's fees until a later period.   Monger, Tr. 1177-79; USX 485.   The OTHELLO and STARS transactions had similar characteristics.   Wilkerson, Tr. 1845-46; Monger, Tr. 1307; USX 950 at 3; USX 634.   The November 2003 Senate Hearings on tax shelters characterized OTHELLO as "a potentially abusive tax shelter."   USX 1526 at 193, 228.

## 3.   Project Knight

Near the termination of STARS, BB&T entered into another tax shelter with Barclays known as Project Knight.   Johnson, Tr. 253-54; PX 260 at 259802.   In January 2007, BB&T anticipated that Project Knight would involve receiving a $4 billion loan from Barclays for three years at a floating interest rate of LIBOR[4] minus 40 basis points. USX 1944 at 2.   BB&T believed that Project Knight would produce a $12 million tax benefit each year.   Id.

Project Knight had many features "very similar" to STARS.   Johnson, Tr. 255-56. Like STARS, Project Knight involved setting up an entity structured as a joint investment between BB&T and Barclays.   Id.   While the joint investment in STARS was a trust, in Project Knight it was a partnership.   Id.   Just as in STARS, Project Knight involved placing assets in the structure to generate income – the same auto loan assets used in STARS.   Johnson, Tr. 255, 352.   Project Knight involved a forward sale agreement for undoing ownership interests at the end of the transaction.   Johnson, Tr. 255.   Project Knight incorporated a swap instrument designed to turn a fixed-rate interest rate

---

[4]   "LIBOR" refers to the London Inter-Bank Offer Rate, and is comparable to the "prime rate" in the United States.   A "basis point" is 1/100 of a percentage point.

obligation into a floating interest obligation.  Id.  Project Knight involved a purported sub-LIBOR loan from Barclays to BB&T, which has been characterized as a sharing of Barclays' U.K. tax benefits.  Johnson, Tr. 258; USX 1944 at 2.  BB&T and Barclays could unilaterally terminate Project Knight early for any reason.  Johnson, Tr. 324.

The termination provisions in Project Knight were important to the parties.  BB&T contemplated that the IRS might challenge Project Knight, and it planned to terminate the transaction if this occurred.  USX 1944 at 3.  BB&T also expected that Barclays would terminate Project Knight early if it did not receive its planned tax benefits, and BB&T would do the same if its tax benefits were not forthcoming.  Johnson, Tr. 286-88; USX 1944 at 3.

BB&T and Barclays terminated Project Knight in 2008.  Watson, Tr. 2876.  Barclays had come under mounting media attention regarding its role in U.S. banks' participation in foreign tax shelters.  On March 29, 2009, the U.K. newspaper *The Guardian* reported "U.S. banks pull out with 11 billion Barclays tax avoidance partnerships:  Bank of America and BB&T repay loans early, Project Knight meant to generate 100 million next year."  Johnson, Tr. 332-36.  *The Guardian* also referred to Barclays' Structured Capital Markets unit as "a tax avoidance factory" and reported that in 2009, whistleblowers uncovered SCM's "dark arts practice" that "created multibillion pound deals, which routed vast amounts of money in elaborate circles through offshore networks with the prime purpose of magic-ing profits out of tax credits."  Peacock, Tr. 2270-71; Monger, Tr. 1220-23.  As noted above, Barclays disbanded its SCM unit in the wake of negative publicity.

C.  Design and Development of STARS

BB&T's STARS transaction does not stand in isolation.  Barclays and KPMG principally developed the concept of STARS over a long-term period to achieve tax benefits.  Barclays and KPMG marketed STARS to bank and non-bank businesses in the United States, and ultimately executed STARS transactions with six U.S. banks, including BB&T.  The evolution of the STARS structure, and the near identical method of implementation with the six U.S. banks, sheds light on the purpose of STARS and its dependence on a series of tax-motivated steps.

1.  Developers

Sohail Sultan of Barclays' SCM division led the development of STARS.  Sultan, Dep. 73.  Mr. Sultan also marketed other SCM products to U.S. financial institutions and remained engaged in the execution of STARS deals as a transaction team leader.  Id.  Originally, STARS was a strategy to enhance the investment yield of large, cash-rich corporations in the United States, Canada, and Europe.  Id. at 25.  Mr. Sultan marketed the early iteration of STARS to Microsoft, AIG, Intel, and Prudential.  Id. 187-88.  In

general, these entities responded that the yield enhancement was not attractive enough to justify the level of complexity and potential risks.  Id.  With this feedback, Barclays decided to retain the structural components from the early iterations of STARS and combine them with a financing vehicle that might be attractive to banks.  Id. at 60-62.

The London law firm of Freshfields, Bruckhaus, Deringer LLP assisted Mr. Sultan with the development of the STARS structure.  Mark Watterson of Freshfields analyzed the U.K. tax treatment of STARS and provided advice to Barclays on the tax effects of including the unit trust and the U.K. trustee, both of which were central components of STARS.  Watterson, Dep. 18, 29-33.  Mr. Watterson conveyed his views of U.K. tax treatment to KPMG's Mr. Brockway for use in determining how STARS might be characterized from a U.S. tax perspective.  Id. at 123-24.

During the period when Barclays developed STARS, Barclays had an agreement with the U.K. taxing authority, Her Majesty's Revenue & Customs ("HMRC"), under which all newly-closed SCM transactions would be submitted for review at the end of the year to determine whether they would be challenged under U.K. tax law.  Williams, Dep. 114-17.  This process allowed Barclays' Tax Group to explain the complex structures and draw HMRC's attention to potential nuances that might not otherwise be apparent.  Id. at 121-22.

In 2001 and 2002, John Mawson served as the U.K. Principal Inspector of Taxes responsible for reviewing the tax affairs of the Barclays Group.  Id. at 116-17.  Starting in August 2001, Messrs. Williams and Mawson engaged in discussions regarding the first STARS deal, the First Union Bank transaction referred to as Monument Street Funding.  Id. at 113-14; USX 358.  In a letter dated April 16, 2002, Mr. Williams stated "[i]n respect of both First Union and Bank of New York transactions this leads to additional U.K. corporate tax payable by the Barclays Group as a result of the transaction of £5.7m in 2001 and approximately 30.2m in 2002 (please see schedule at Point 4 below.)"  USX 557 at 2-4; Zailer Tr. 2696-97.  Mr. Watterson of Freshfields observed "if the U.K. Revenue could see that these transactions [STARS] were tax additive to the Revenue or to the Exchequer then they'd probably be less minded to seek to challenge the result that Barclays was looking to achieve."  Watterson, Dep. 107-08.  In reality, however, Barclays did not pay any U.K. corporate tax on either of these STARS transactions. Zailer, Tr. 2697.  The amounts listed in Mr. Williams' April 16, 2002 letter actually were paid by First Union and the Bank of New York, through the trustees of their Delaware trusts.  Id. at 2698, 2702.  This letter makes it appear that Barclays is paying a U.K. corporate tax, but in fact Barclays was receiving tax benefits while paying no U.K. tax at all. Zailer, Tr. 2700-05; Demo. Ex. 12-13; USX 557.

Through collaboration with Barclays, KPMG specialized in developing transactions that took advantage of differences between tax systems, including STARS. Wilkerson, Tr. 1779-80.  The initial STARS development focus was on achieving tax

13

objectives, including U.K. tax objectives. Id. at 1757. For the U.S. participants, the primary objective was to claim foreign tax credits, while characterizing the transaction as a financing. Id. 1757, 1774. Without the foreign tax credits, the STARS transaction would not be profitable to the U.S. taxpayer. Id. at 1760-61. In order to characterize STARS as involving a loan, KPMG wanted to avoid "negative interest" and to assure that the U.S. participant receiving the loan would make at least some positive interest payments. Id. at 1759. However, in the BB&T STARS deal, the first 35 months of the transaction involved payments from Barclays (as lender) to BB&T (as borrower), and no payments going the other way. Wilkerson, Tr. 1759; Kawaller, Tr. 4901-02; Demo. Ex. 18; USX 1994 at 22.

Mr. Brockway of KPMG performed extensive development work on STARS to enable Barclays and KPMG to market the transaction. USX 192 at 3. In the first half of 2000, nearly all of KPMG's time devoted to STARS consisted of Mr. Brockway's services. Id. Mr. Wilkerson joined Mr. Brockway in analyzing technical tax issues relating to the First Union transaction, including the important question of whether First Union would be allowed to claim foreign tax credits under Internal Revenue Code ("IRC") § 901. Wilkerson, Tr. 1679-80. Mr. Wilkerson also analyzed the possible use of deconsolidation to assure that First Union could fully utilize the foreign tax credits, an issue that also arose in the BB&T STARS transaction. Id. at 1760.

In developing STARS, KPMG treated Barclays as its client. Wilkerson, Tr. 1755-56; Sultan Dep. 655; USX 957 at 1-3. Under a revised fee arrangement, KPMG's accrued time was folded into the value based fee, and thus made contingent on the closing of a STARS transaction. USX 192 at 3. KPMG understood that Barclays would pay a larger fee on STARS transactions where KPMG had identified the client or played an important role in Barclays "landing the engagement." USX 108 at 2. KPMG initially expected a $1 million fee from Barclays if the first STARS transaction (First Union) successfully closed. Wilkerson, Tr. 1763; USX 108 at 1. Instead, Barclays paid KPMG $4 million for the First Union STARS deal, and more fees were promised if other STARS transactions could be closed. Wilkerson, Tr. 1763-65; USX 108 at 2.

In light of the fee structure, KPMG encouraged its professionals to promote STARS and provided incentives for them to do so. Wilkerson, Tr. 1776; USX 342. Mr. Wilkerson personally met with prospects, including SunTrust Bank, Regions Bank, and Key Bank to present STARS and explain its U.S. tax benefits. Wilkerson, Tr. 1769-71. Mr. Wilkerson conveyed his view that the transaction would achieve its intended U.S. tax objectives by generating foreign tax credits in the United States while allowing the structure to be characterized as a financing. Id. 1773-74. KPMG hoped that it could realize more fees through the execution of additional STARS transactions. Id. at 1772. The relationship between Barclays and KPMG was so close that Mr. Brockway even asked for input from Mr. Sultan on setting compensation levels for KPMG professionals working on STARS. Wilkerson, Tr. 1792; USX 957 at 3. Mr. Sultan suggested

compensation of approximately $1 million for each of the KPMG persons with whom Barclays worked.  USX 957 at 2.

### 2.  Early Iterations of STARS

STARS was not always characterized as "low cost financing."  Sultan, Dep. 188; PX 312 at 224352R.  In 1999, STARS conceptually began as an investment-based transaction or an "asset play" involving a U.K. unit trust that would "generate an enhanced return for a U.S. investor by way of a Stock Lending Arrangement (SLA)." Sultan, Dep. 188; USX 69 at 1.  The transaction would "enhance[] the yield on an existing portfolio of assets held by a U.S. counterparty, generated by allowing Barclays to claim the taxes paid on the income accrued on the portfolio of underlying assets through a U.K. unauthorised trust."  PX 312 at 224352R.  The enhanced yield would be accomplished through a stock loan from the U.S. participant to Barclays with the U.S. participant receiving lending fees that represented a split of the tax benefits.  Id.

This "asset play" investment version of STARS did not have a loan component going from Barclays to the U.S. participant.  Abrahams, Dep. 263-64; USX 89. However, a STARS transaction did not need a loan component to accomplish its tax objectives. Abrahams, Dep. 742. From Barclays' standpoint, a STARS deal only needed a U.S. counterparty to help Barclays create a purported trading loss that formed part of the transaction's U.K. benefit for Barclays.  Id. at 742-44, 859-62.  Without a counterparty to create the appearance of some financial activity, Barclays may not have been able to deduct the purported loss for U.K. tax purposes.  Id.

Barclays marketed the investment version of STARS to well-known corporations, AIG, Microsoft, Intel, and Prudential. Sultan, Dep. 188.  Barclays targeted these entities because they were viewed as having excess assets that could be used to move revenue through the transaction structure.  Id.  This version of STARS had no loan component. Mr. Sultan found, for example, that Microsoft was not plausibly interested in a $1.5 billion loan.  Id. at 188-89.  By lending to a corporation such as Microsoft, Barclays would need to maintain 100 percent of its regulatory capital requirements associated with such a loan, as opposed to a fractional amount for bank lending.  Id. at 189-91. Ultimately, none of the targeted U.S. companies chose to participate.  Id. at 194; James, Tr. 3832.  STARS therefore had to evolve by adding a loan component to the transaction, which Barclays was able to sell to six banks.

Barclays would have preferred to execute STARS without a loan to the U.S. participant, because the loan feature required Barclays to commit capital to the transaction.  Id. at 209-10.  By adding a cash loan, Barclays was required to retain more regulatory capital.  Id. at 209-211.  However, the economic benefit to the U.S. participant arising from its foreign tax credits remained the same for both the investment version and the later loan version of STARS.  Sultan, Dep. 349-50; USX 102.

3. <u>Prior STARS Transactions With First Union and Bank of New York</u>

Barclays entered into six STARS transactions with U.S. financial institutions between 2001 and 2005:  First Union National Bank in June 2001, Bank of New York in November 2001, BB&T in August 2002, Wells Fargo in November 2002, Sovereign Bank in November 2003, and Washington Mutual in June 2005.  PX 297 at 204207R; JX 2; USX 1502; USX 2095; USX 2210 at 41, n.97; USX 2212 at 121.  Two of these transactions, First Union and Bank of New York, closed before the BB&T STARS transaction.  Barclays itself has described First Union as "very similar" to BB&T STARS.  PX 297 at 204207R.

The First Union STARS transaction involved financing in the amount of $2.5 billion and a commitment of approximately $7 billion in First Union assets to the STARS trust structure.  Ioannidis, Dep. 150; Sultan, Dep. 193; USX 358 at 2; USX 1389.  The First Union STARS transaction currently is in litigation.  As successor in interest to First Union through its merger with Wachovia in 2001 and through its acquisition of the merged entity, Wells Fargo filed suit on August 13, 2012 challenging the IRS tax treatment of the First Union STARS transaction.  The litigation is ongoing.  <u>Monument St. Funding Trust, Centurion Funding, Inc., Tax Matters Partner v. Comm'r</u>, Dkt. No. 20216-12 (U.S. Tax Court, 2012).

Bank of New York ("BNY") was the second U.S. financial institution to implement a STARS transaction with Barclays, on November 9, 2001.  Chapman, Tr. 3008.  At that time, BNY was engaged in the banking business and had worldwide banking operations.  <u>Bank of New York Mellon Corp. v. Comm'r</u>, 140 T.C. 15, 17 (2013).  KPMG introduced STARS to BNY during discussions with the bank's tax director.  <u>Id.</u>  Thereafter, KPMG and Barclays presented STARS to BNY through various meetings, discussions, promotional materials and correspondence.  <u>Id.</u>  Barclays described BNY STARS as "substantially similar" and "very similar" to BB&T STARS.  PX 297 at 20407R, 204214R.  The transaction involved a $1.5 billion financing and a commitment of more than $7.8 billion in BNY assets to the STARS trust structure.  <u>Bank of New York</u>, 140 T.C. at 20-21.

The IRS challenged BNY STARS, and the matter was tried in the U.S. Tax Court in April 2012.  The Tax Court issued an opinion on February 11, 2013, finding in favor of the Government.  The Tax Court concluded:

> In sum, the STARS transaction (bifurcated or integrated) lacks economic substance and Congress did not otherwise intend to provide foreign tax credits for transactions such as STARS.  Accordingly, the STARS transaction is invalid for

Federal tax purposes and the foreign tax credits and expense deductions claimed in connection with it are disallowed.

Id. at 48.  The Tax Court emphasized:

> The STARS transaction was structured to meet the relevant requirements in the Code and the regulations for claiming the disputed foreign tax credits.  The STARS transaction in essence, however, was an elaborate series of pre-arranged steps designed as a subterfuge for generating, monetizing and transferring the value of foreign tax credits among the STARS participants.

Id. at 31.  In addition, the Tax Court found that "the activities or transactions that the STARS structure was used to engage in did not provide a reasonable opportunity for economic profit.  The STARS structure's main activity was to circulate income to itself and Barclays . . . .  These circular cash flows or offsetting payments had no non-tax economic effect."  Id. at 35-36.

## D.  Marketing of STARS to BB&T

### 1.  Initial Contact with KPMG

In November 2001, Mr. Monger received a telephone call from Maurice Beshlian of Barclays, in which Mr. Beshlian asked Mr. Monger to put him in contact with BB&T's corporate tax director regarding "tax implications" of the STARS transaction.  Monger, Tr. 958-63.  Thereafter, on November 20, 2001, Messrs. Beshlian and Sultan of Barclays participated in a telephone call with Mr. Watson, the head of BB&T's Tax Department, in which they "discussed in some detail [BB&T's] appetite to do a [foreign tax credit] trade."  USX 308.  In the follow-up correspondence, they agreed to meet in January 2002 to discuss the STARS transaction and the tax issues involved.  Id.; Monger, Tr. 625, 632.

On January 17, 2002, Mr. Monger and Mr. Watson met with three tax specialists from KPMG – David Brawley, Charles Butler, and David Schenck – who made a presentation to BB&T regarding the STARS transaction.  Watson, Tr. 3423-35; Monger, Tr. 966; JX 241.  At the time of this meeting, both Mr. Watson and Mr. Monger were aware that KPMG was intricately involved in the development of the STARS transaction and that KPMG had participated in implementing two prior STARS transactions with U.S. banks.  Monger, Tr. 632; Watson, Tr. 3441.  Around this time, BB&T Chief Financial Officer Scott Reed tasked Mr. Monger with coordinating BB&T's efforts on the STARS transaction.  Monger, Tr. 1045.

In its presentation to BB&T, KPMG proposed a trust asset base of $3.5 billion and a proposed loan of $1 billion.  USX 343; JX 241; Monger, Tr. 969-71; Watson, Tr. 3423-24.  KPMG explained that BB&T's benefit from STARS would be "based on the U.K. tax credit" and that the greater the amount of Barclays' tax credits, the greater the benefit to BB&T.  Monger, Tr. 973-75; Watson, Tr. 3430.  KPMG also stated that BB&T's interest charge on the loan would be reduced by half of the U.K. tax paid by the STARS trust.  Watson, Tr. 3427-28.  Mr. Monger understood that, as a result of the STARS transaction, Barclays would not receive any fee from BB&T, but rather would receive "a split of tax credits."  USX 343; JX 241; Monger, Tr. 992-93.  KPMG further explained that BB&T would never lose control of the assets it committed to STARS, nor would it lose control of the income from those assets.  Monger, Tr. 978-79.  During the meeting, KPMG explained that the Class C Unit distribution amounts would be paid into an account held by BB&T in Barclays' name, and that all money paid into that account would simultaneously be returned to the trust.  Although the account was held in Barclays' name, Barclays would have no control over that account, and only BB&T employees would make transfers in and out of the account.  Monger, Tr. 988-89.  KPMG also noted that BB&T might have an "overall foreign loss" across the consolidated BB&T group, which would limit or prevent BB&T's ability to claim foreign tax credits for the U.K. taxes paid by the trust.  JX 241; USX 343; Monger, Tr. 993-94.  In the event of such a loss, KPMG suggested that BB&T may be able to avoid limitations on claiming foreign tax credits by deconsolidating a special purpose entity BB&T employed to implement STARS.  Monger, Tr. 993-94.

After this initial meeting, on January 28, 2002 Mr. Butler of KPMG sent an email to Mr. Watson and Mr. Monger.  USX 366; Watson, Tr. 3432.  In encouraging BB&T to implement the transaction, Mr. Butler referred to STARS as one of few "tax related opportunities to achieve significant above the line savings."  USX 366..  Mr. Butler also addressed the issue of a potential overall foreign loss, stating that "we also need to confirm whether, as a result of LILO investments, BB&T has an overall foreign loss for purposes of calculating the foreign tax credit."  USX 366.  On February 20, 2002, Mr. Butler sent a follow-up email, in which he stated: "A deconsolidation would allow the full foreign tax credit [from STARS] to be utilized for book and tax purposes, notwithstanding the existence (to be confirmed) of foreign losses from the LILO transactions."  USX 402; Watson, Tr. 3449-51.  The proposed deconsolidation would be accomplished by issuing preferred stock in the entity to be deconsolidated; that preferred stock would need to transfer 20 percent or more of the voting interest in the entity to the preferred stockholder.  Watson, Tr. 3451-52; USX 402.  BB&T eventually concluded that it "would be better off going ahead and doing the deconsolidation."  Monger, Tr. 999-1000.

2.  <u>Communications with Barclays</u>

Also in January 2002, Mr. Monger met with Messrs. Jenkins, Sultan, and Beshlian of Barclays regarding STARS.  <u>Id.</u> at 1003-04.  The Barclays representatives described the STARS transaction as applicable to BB&T, which contemplated a $1.5 billion loan to BB&T and a benefit of $44 million in the first year alone, based on the 50/50 split of the trust's U.K. tax liability of $88 million.  USX 340; Monger, Tr. 1010-11.  Barclays characterized this benefit as a 293-basis-point reduction in BB&T's interest rate on the loan, which it calculated by dividing the $44 million benefit to BB&T by the $1.5 billion loan amount to BB&T.  USX 340; Monger, Tr. 1010-11.

On February 4, 2002, Mr. Ioannidis of Barclays sent Mr. Monger a clarifying email regarding the STARS projection for BB&T.  JX 242; Monger, Tr. 1012-13.  Mr. Ioannidis explained Barclays' belief that STARS could be structured in a way that BB&T could avoid paying North Carolina state taxes on the trust income.  JX 242.  Mr. Ioannidis also clarified that "[a]ll the income received by Barclays on the [Class C Units] will be mandatorily reinvested into additional consideration for these units.  Thus, the asset pool will increase each year, effectively generating additional income. . . . Over the 5 years, this accretion is expected to result in $22 million of additional benefits for BB&T."  <u>Id.</u>  Further, Mr. Ioannidis explained that BB&T's monthly benefits from STARS would be subject to an adjustment as a result of "timing delays in [Barclays] obtaining tax credits," but noted that "BB&T will obtain the full benefit of timing delays in paying income taxes in the Trust."  <u>Id.</u>

On February 14, 2002, Mr. Ioannidis sent Mr. Monger a memorandum entitled "Project STARS Q&A."  JX 243.  In this memorandum, Mr. Ioannidis revisited the possibility of BB&T avoiding state taxation.  <u>Id.</u>  He explained, "[i]f InvestCo is formed in the appropriate State and if structured correctly," then BB&T could avoid paying state income taxes on income generated by the assets committed to STARS.  <u>Id.</u>  Mr. Ioannidis also discussed the possibility of withholding taxes, explaining that "[f]ollowing the recent changes to the U.K./U.S. double transaction treaty," any interest payments in the transaction deemed "contingent" could be subjected to a 20 percent withholding tax.  <u>Id.</u>  He further explained that to avoid any risk of withholding, the parties needed to agree on fixed pre-determined amounts for the monthly payments from Barclays to BB&T under the Zero Coupon Swap.  <u>Id.</u>

These monthly benefits that BB&T received from the STARS transaction were referred to as the Bx.  JX 35; Monger, Tr. 1017-19.  As described in the Formulae Letter, "the $b_x$ is equal to 51 percent of the tax credits received by Barclays on the Class C Unit."  JX 35.  Mr. Monger understood the Bx to be a sharing agreement between Barclays and BB&T, in which Barclays would reduce BB&T's interest rate expenses based on the tax credit Barclays received.  Monger, Tr. 1110-11.  Contemporaneously, Mr. Monger referred to the Bx payment as a "[r]ebate from Barclays."  USX 437; USX 465.

To protect itself and ensure that the taxes BB&T paid to the STARS trust were sufficient to match the necessary predetermined Bx payments, Barclays required an indemnity provision.   JX 23; Monger, Tr. 1203-04.   The "Expected Class C Unit Distributions" were also predetermined, as they were calculated to coordinate with the predetermined Bx payments.   JX 23; Monger, Tr. 1204-05.   The combination of these predetermined amounts and distributions, along with the indemnity provision, led Mr. Ioannidis to conclude that "[t]here will not be any withholding tax in the STARS transaction."   JX 243.

In mid-February, Mr. Sultan sent a memorandum to BB&T entitled "STARS Benefit Analysis," which Mr. Monger received and reviewed.   JX 244.   Mr. Sultan explained that "the benefits [from STARS] are driven from the asset side and asset yield only."   Id.   In this memorandum, Mr. Sultan also discussed the calculation of benefits that STARS would generate, noting that "[t]he benefit under STARS arises from the ability of both parties to obtain credits for the taxes paid in the Trust.   Thus, the benefits to both BB&T and Barclays are easy to calculate and are equal to 50% of these taxes for each party."   JX 244; Monger, Tr. 1032-34.   In describing a sample accounting of the potential benefits to BB&T, Mr. Sultan stated that "[t]o calculate BB&T's real benefit from STARS, we have to deduct the [Trust] Asset Income (which would be received by BB&T anyway)."   JX 244.

Mr. Monger understood Mr. Sultan's statements to mean that the benefits of the transaction were driven by the size of the trust asset pool and the yield on those assets.   Monger, Tr. 1031-32.   Nonetheless, Mr. Monger conducted several of his own calculations regarding BB&T's potential economic benefits from STARS.   Id. at 1037-39; USX 437.   In his calculations, Mr. Monger assumed that the use of $1.5 billion of loan proceeds from STARS and the use of $1.5 billion of loan proceeds from an alternate borrowing would yield the same amount, and thus would cancel out.   Monger, Tr. 1038-39.   He did not include the potential yield on use of the loan proceeds as an element of profit in his analysis.   Id.

During this information exchange between BB&T and Barclays, BB&T began to hear that another U.S. bank had declined to enter into a STARS transaction.   On or about February 18, 2002, personnel in BB&T's funding department informed Mr. Watson that SunTrust had rejected entering into a STARS transaction because of potential tax risk.   Watson, Tr. 2857, 3443-46; USX 396.   Mike Blevins of BB&T also communicated to Mr. Monger information received from SunTrust employees, that "[t]hey didn't pursue the transaction because of their concern over long-term tax implications, and the status of their foreign tax credit."   USX 388; Monger, Tr. 678, 681-82.   Mr. Monger relayed this information to Mr. Watson and Mr. Reed.   Monger, Tr. 682-83; USX 388.   Mr. Watson then investigated this information by calling Deborah Jameson, the tax director of SunTrust.   Watson, Tr. 2856-58.   Mr. Watson testified that in their correspondence, Ms.

Jameson told him that she had "liked" the transaction, but did not have the time to conduct proper due diligence on it. Id. at 2858.

### 3.  Discussions Regarding STARS Tax Risks

On February 26, 2002, Mr. Reed gave a presentation to BB&T Corporation's Board of Directors, in which he informed the Board of the potential STARS transaction. JX 245; PX 29.  Mr. Reed described the expected benefit to BB&T from STARS as "one-half of UK tax credit received by investor [Barclays] for UK income taxes paid by Trust."[5] PX 29; Monger, Tr. 1045-46, 1051-52; Watson, Tr. 3452-55.  Two days later, on February 28, 2002, Mr. Ioannidis sent Mr. Monger an email showing Barclays' analysis and allocation of BB&T tax risks as a result of STARS. USX 453; Monger, Tr. 1145-48.  Under Barclays' allocation of tax risk, "the US tax repo risk falls with BB&T and the risk of Barclays getting the tax credits falls with Barclays." USX 453.  However, the risk that the STARS trust would be found either not a tax-resident or a collective investment scheme in the U.K. would be shared between Barclays and BB&T. Id.

From the outset, in BB&T's and KPMG's discussions regarding STARS, KPMG informed BB&T that the transaction involved tax risks.  Watson, Tr. 3461.  During the course of multiple meetings and correspondence among BB&T, Barclays, and KPMG, the potential downside risks and tax ramifications of STARS were discussed.  See, e.g., USX 431; JX 247.  One of these downside risks was the possible situation in which BB&T was not allowed to take the full foreign tax credit, but was nevertheless allowed to take a deduction on its U.S. tax returns for the U.K. tax it paid.  JX 247; Monger, Tr. 1097-98.  Mr. Monger relied upon KPMG's representations that deducting the U.K. taxes paid in STARS would be possible, and did not obtain any independent analysis.  Monger, Tr. 1100.  At the time of KPMG's representations in March 2002, Mr. Monger knew that KPMG had not been paid for any of its work on BB&T STARS, and that KPMG would not be paid for its work if BB&T decided not to close the transaction. Id. at 1100-01.

Mr. Monger did, however, prepare his own calculation of BB&T's potential downside U.S. tax risk.  USX 437; Monger, Tr. 1105-06; Watson, Tr. 3465.  On March 8, 2002, he circulated his "Illustration of Downside Risk" to Messrs. Watson and Butler, in which he referred to the potential $44 million benefit to BB&T as a "Rebate from Barclays."  USX 437; Monger, Tr. 1108-10; Watson, Tr. 3465-66.  This "rebate" was precisely half of the $88 million listed as U.K. taxes payable in STARS and the $88 million in projected foreign tax credits.  USX 437.  This illustration also showed the interest expense for borrowing the $1.5 billion (at 5.25 percent) as $78,750,000, an expense not reduced by the $44 million rebate that BB&T expected to receive from Barclays. Id.  In making these calculations, Mr. Monger assumed that the yield to BB&T

---

[5] Both Messrs. Monger and Watson assisted in preparing the slides presented by Mr. Reed, although they did not attend the meeting.

on the $1.5 billion loan proceeds would be identical to the cost of borrowing that amount: 5.25 percent. JX 247; Monger, Tr. 1113-14. In order to isolate the profit attributable to the STARS transaction, Mr. Monger made a typical banking assumption that BB&T would realize no profit on the $1.5 billion loan proceeds. Monger, Tr. 1114-15. At the time when Mr. Monger prepared these calculations, he knew of the possibility that the monthly rebates from Barclays could offset BB&T's monthly interest payments. Id. at 1111-12. This scenario would result in Barclays making net monthly payments to BB&T, which would be characterized as "negative interest" on BB&T's tax returns and financial statements. Id. In correspondence that followed the circulation of Mr. Monger's calculations, Messrs. Monger and Butler agreed that the amount of BB&T's tax risk or "downside" was equal to the amount of BB&T's potential benefit from STARS. Id. at 1122.

On March 20, 2002, Mr. Butler sent a formal letter to Mr. Reed, addressing the tax risks BB&T faced from STARS. Monger, Tr. 1126-27; Watson, Tr. 3466; JX 250. Messrs. Monger and Watson had previously reviewed this letter, and knew that the tax risks to BB&T included the inability to claim foreign tax credits, a finding that the transaction lacked economic substance, and the potential for an IRS assessment of penalties. Monger, Tr. 1102-04, 1126-37; Watson, Tr. 3466-68; JX 248.

On March 21, 2002, Mr. Butler sent an email to Mr. Sultan in which he recapped a meeting he had with Messrs. Reed, Monger, and Watson, and Sherry Kellet of BB&T. Monger, Tr. 1151-52; USX 470. The meeting participants had discussed KPMG's risk assessment, which was satisfactory to BB&T. USX 470; Monger, Tr. 1155. The participants also negotiated KPMG's fees. USX 470; Monger, Tr. 3469-73. KPMG initially requested $8 million in fees on the STARS transaction, but BB&T sought to reduce its exposure in the event of an early termination of the transaction. USX 470; Watson, Tr. 3469-70; Monger, Tr. 1156-57. KPMG offered to provide future services supporting the foreign tax credit calculations, and thereby defer $2 million of the requested fees. USX 470. Ultimately, BB&T negotiated an agreement in which KPMG would provide approximately 350 hours of professional service if the STARS transaction was examined or challenged by the IRS on audit. Watson, Tr. 3471-73, 3622-25; JX 254.

That same day, BB&T announced that it had fired the Arthur Andersen accounting firm as its outside auditor and had engaged PwC in that capacity. Monger, Tr. 1152-53; USX 470. In March and April 2002, BB&T provided PwC with materials to review the proposed STARS transaction. USX 465; Monger, 1248-51.

KPMG and BB&T continued to negotiate KPMG's fees, and on March 27, 2002, Mr. Monger proposed a fee deferral similar to the fee arrangement in the OTHELLO transaction, where payment was deferred until the deal had either closed or been examined by the IRS. USX 485. On April 2, 2002, Mr. Butler sent an email to KPMG's Vice Chairman, reporting a verbal agreement on KPMG's fee for the transaction. USX

2238.  Mr. Butler explained that "[t]he transaction will still be contingent upon PWC signing off on the tax and accounting treatment." Id.  Mr. Monger also believed that BB&T's participation in STARS would only occur if PwC signed off on the transaction. Monger, Tr. 1190-93.

On April 5, 2002, BB&T and KPMG entered into an engagement letter agreement for tax advisory services related to STARS.  Monger, Tr. 1193; JX 254.  The agreement provided that BB&T would pay KPMG $6.5 million in fees for its work on BB&T STARS, and of that amount, $500,000 would be deferred for each of the five projected years of STARS.  Monger, Tr. 1196; JX 254.  These fees were to cover "implementation assistance, 350 hours of examination assistance and US opinion."  JX 254.

BB&T's Executive Management committee planned to meet on April 8, 2002, and Mr. Monger requested that Barclays and KPMG send representatives to this meeting.  PX 36; Monger, Tr. 1148-49.  Together with Mr. Monger, Mr. Ioannidis prepared a presentation on BB&T's exposure to tax risks related to the STARS transaction and KPMG's assessment of those risks.  PX 36; Monger, Tr. 1148, 1217, 1224-27; JX 255.  A few days before the committee meeting, Mr. Butler circulated a draft opinion memorandum on the U.S. tax consequences of STARS to Messrs. Monger, Watson, and Cox.  Watson, Tr. 3473; PX 46.  Mr. Watson provided PwC with a copy of the KPMG memorandum, as well as a copy of a redacted STARS legal opinion from Sidley Austin. Watson, Tr. 3501-02.  BB&T did not ask PwC to issue its own opinion on the STARS transaction, id. at 3502-03, even though BB&T's participation in STARS was contingent upon PwC being "comfortable with the transaction at a high level," id. at 3495-500, USX 529, Monger, Tr. 1238-47.

On April 17, 2002, Messrs. Monger and Ioannidis exchanged emails regarding STARS.  USX 559; Monger, Tr. 1227-38.  Mr. Monger inquired whether Barclays would be willing to increase the size of the borrowing in STARS or "the size of the trust and therefore the size of the tax credits."  USX 559.  Mr. Ioannidis replied that Barclays likely would be interested in increasing the size of the trust "and hence the benefit for both parties," but noted that an increase in the loan size might be more difficult.  Id. During the next few weeks, Messrs. Monger and Watson conferred with representatives from KPMG and PwC regarding opinion levels and downside risk potential to BB&T from STARS.  Watson, Tr. 3504-05; Monger, Tr. 1251-55.  In particular, the transaction participants discussed whether BB&T would be able to deduct the U.K. tax payments on its U.S. returns in the event that STARS was determined to lack economic substance. USX 564.  Mr. Watson asked KPMG to research that issue, as the loss of a deduction would add significantly to BB&T's potential downside risk.  Watson, Tr. 3506-08.  Mr. Butler concluded that deductions would only be disallowed "if a court believed you engaged in such a sham that they would not even allow economic losses. . . . I am assuming we [KPMG] believe such a chance is so remote as to not need to be considered."  USX 564.

On April 30, 2002, Mr. Ruble of Sidley Austin sent Mr. Monger a redacted favorable tax opinion regarding STARS, which Mr. Watson also reviewed.  USX 599; Monger, Tr. 1265-66; Watson, Tr. 3508-09.  KPMG had recommended Mr. Ruble and his law firm to BB&T because of his work on previous STARS transactions.  Watson, Tr. 3511-12.  At the time of Mr. Ruble's April 30 email forwarding the tax analysis opinion, BB&T and Sidley Austin had not reached a fee agreement for work on STARS.  Monger, Tr. 1267.

On May 7, 2002, BB&T formally engaged Sidley Austin for the STARS transaction.  Monger, Tr. 1295; JX 264.  The engagement letter provided that BB&T would pay Sidley Austin a flat fee for its "Tax Representation," with the amount dependent on the need for deconsolidation.  Monger, Tr. 1295-97; JX 264.  Tax Representation included federal income tax advice and the provision of a tax opinion on STARS.  JX 264.  All "other legal advice and documentation" with respect to STARS was defined as "Corporate Representation," which would be billed at Sidley Austin's usual hourly rates on a monthly basis.  Id.; Monger, Tr. 1296-97.  The engagement letter also contained a waiver by BB&T of any legal conflict with Sidley Austin's past and potential future representation of Barclays Bank and its affiliates.  JX 264.

### 4.  Negotiation of STARS

In early May 2002, representatives from BB&T and KPMG discussed whether BB&T would have an overall foreign loss from its LILO transactions, and if so, how BB&T's STARS transaction could be structured to preserve BB&T's ability to claim foreign tax credits.  Monger, Tr. 1267-68; Watson, Tr. 3513-14; PX 68.  BB&T provided KPMG with detailed information on the LILO and SILO transactions BB&T had engaged in between June 1997 and July 2001.  Watson, 3515-16; PX 68.  From this information, KPMG calculated that, through December 31, 2001, BB&T had a cumulative tax loss on the transactions of $1.4 billion.  Watson, Tr. 3516; PX 68.  KPMG stated that BB&T would have a current overall foreign loss in subsequent years.  PX 68.  Therefore, KPMG concluded that "it will be necessary to structure the STARS transaction through a deconsolidated entity that will generate passive basket income in order to utilize the credits" generated by STARS.  Id.  Based on its projected overall foreign loss, BB&T decided to deconsolidate InvestCo as part of STARS.  Watson, Tr. 3516-17, 3521.[6]

The Participation Agreement for BB&T's STARS transaction provided that BB&T would indemnify Barclays for losses if the BB&T STARS trust was not found to be a U.K. resident or a collective investment scheme under U.K. law.  Monger, Tr. 1302-

---

[6] Mr. Watson testified that BB&T would not have needed to deconsolidate InvestCo, because after the IRS challenged the LILO and SILO transactions, the settlement with the IRS precluded BB&T from claiming tax losses arising from them.  Watson, Tr. 3517-18.

03; JX 17.  At this time, BB&T had no U.K. or other foreign presence, and Mr. Monger expressed concern regarding the foreign tax treatment of the STARS trust.  PX 67.  Given that KPMG was "on both sides" of the U.K. residency risk because of its representation of Barclays, PX 67, Sidley Austin provided a U.K. legal opinion on the issue.  Monger, Tr. 1301-02; JX 287.

On May 20, 2002, Nicholas Vasudeva of Barclays circulated an email and memorandum to BB&T and Barclays representatives containing an analysis of the comparative benefits of STARS to BB&T and Barclays.  Monger, Tr. 1309-10; Watson, Tr. 3563-67; JX 267.  In one of these documents, Mr. Vasudeva stated that "BB&T's proposed split of the benefits is 50 percent of the UK tax credit available to Barclays as holder of the C and D Units."  JX 267.  Mr. Vasudeva also separately set forth the U.K. tax loss Barclays expected to receive, stemming from the receipt and mandatory return of the monthly Class C Unit distributions.  Id.  Based on Mr. Vasudeva's memorandum, Mr. Monger generated his own calculation of the various benefits Barclays would claim from STARS, in addition to the tax credits on taxes paid by the STARS trust.  Monger, Tr. 1316.  Based on his own calculations, Mr. Monger asked that BB&T receive a higher percentage of U.K. tax rebates from Barclays, from 50 percent to 51 percent, which was agreed to by the parties.  Monger, Tr. 1316.

On May 29 and 30, 2002, participants from BB&T, KPMG, Sidley Austin, and Barclays held a meeting in New York City regarding STARS.  Id. at 1317-18; PX 77.  After the meeting, KPMG circulated follow-up documents, including a calculation that BB&T could be exposed to a $2 million alternative minimum tax as a result of its participation in STARS.  Monger, Tr. 1318-19; PX 77.  KPMG suggested that BB&T consider this additional cost "in finalizing negotiations with Barclays on the benefit split and breakage fee."  PX 77.

On June 5, 2002, the associate general counsel of BB&T sent a letter to the North Carolina Commissioner of Banks, seeking a non-objection letter for BB&T's participation in STARS.  Monger, Tr. 1322-23; USX 661.  In this letter, BB&T represented that it expected the transaction to "add approximately $25 million of after-tax benefits per annum to BB&T, or, approximately $125 million of benefits" over the entire projected term of STARS.  USX 661.  BB&T also stated that its ability to receive the after-tax benefits described was "predicated on interpretations of both United States and United Kingdom tax laws and regulations."  Id.; Monger, Tr. 1323.

On June 17, 2002, Mr. Ioannidis sent an email to the STARS team members at BB&T, KPMG, Sidley Austin, and Barclays Capital, which included a draft formula letter, formula and cash flow examples, and a spreadsheet model for the numbers in the formula letter.  Monger, Tr. 1209-17; USX 690.  The draft formula letter discussed the "makewhole payment," explaining:

> In summary, this payment compensates Barclays if the
> distributions out of the Trust (and hence tax credits) are less
> than agreed at the start.  Barclays needs to be compensated,
> because it has already paid BB&T a spread based on the
> agreed distributions.  As discussed, the reason why the spread
> has to be pre-determined is in order to avoid potential
> withholding tax on interest payments under the Zero Coupon
> Swap under the new U.S./U.K. Double Taxation Treaty.

USX 690 at 13.  The draft formula letter clarified that the make-whole amount would be
equal to the lost tax credits to Barclays due to the lower trust income.  Id.  Mr. Monger
understood that this payment would be due at the termination of STARS unless BB&T
made up any shortfalls in Class C Unit distributions.  Monger, Tr. 1213-15.  BB&T had
an economic incentive not to allow such shortfalls, as BB&T could not claim foreign tax
credits for payments made to Barclays.  Id. at 1215-16.

On June 27, 2002, the Board of Directors of BB&T met to discuss the STARS
transaction originally presented to the Board in February 2002, and to learn additional
details regarding the proposed transaction.  USX 728 at 1-3, 7-9.  After Mr. Reed gave
the presentation, the directors adopted a resolution approving BB&T's participation in
STARS.  Id. at 5-9.  The Board of Directors for the BB&T holding company also
approved the transaction on or about the same day.  Monger, Tr. 1326-27.  BB&T's
STARS transaction closed on August 1, 2002.  Johnson, Tr. 496; Monger, Tr. 1195-96;
JX 1.

### 5.  Post-Closing Communications

On August 27, 2002, Mr. Watson informed Mr. Reed of the possibility that BB&T
would be subject to an alternative minimum tax due to its participation in the STARS
transaction, and suggested a reassessment of tax-favored investments in order to avoid
such a tax.  Watson, Tr. 3526-31; USX 941.

On October 1, 2002, Mr. Reed sent to KPMG BB&T's representations to be used
by KPMG in issuing its tax opinion on STARS.  Monger, Tr. 1351-54; Watson, Tr. 3539-
42; JX 281.  KPMG had previously written the representations letter, and transmitted it to
BB&T for review and signature.  Monger, Tr. 1352-55.  That same day, Mr. Butler
circulated within KPMG a final draft of KPMG's tax opinion on BB&T STARS.
Watson, Tr. 3552-53; USX 1005.

On October 11, 2002, KPMG sent Mr. Monger an analysis on "Deductions for
Foreign Taxes Paid" if BB&T was not entitled to claim foreign tax credits.  Watson, Tr.
3531-36; JX 284.  KPMG stated that BB&T "should be entitled to a deduction under

section 162, 164 or 165 [of the Internal Revenue Code] in the event they are not entitled to a section 901 or section 903 foreign tax credit." JX 284.

On February 24, 2003, Mr. Monger sought Mr. Ioannidis' opinion on the disclosures BB&T planned to include regarding STARS in its annual Form 10K report to the Securities & Exchange Commission. Monger, Tr. 1356-58; USX 1163. Mr. Ioannidis responded that referring to a trust in the income tax note was "tricky," and that Barclays "may have a small preference for simply stating that these foreign taxes were incurred in the context of a financing deal with a foreign lender." USX 1163. In March 2003, BB&T filed its annual Form 10K for the period ending December 31, 2002. Monger, Tr. 1358-63; JX 209. The filing did not refer to a trust, but instead stated, consistent with Mr. Ioannidis' advice, that "[t]he foreign income tax expense included in the 2002 provision for income taxes is related to income generated on assets controlled by a foreign subsidiary of Branch Bank." JX 209.

On April 7, 2003, Sidley Austin issued its U.K. tax opinion on BB&T STARS, addressing the issues of U.K. tax residency and the characterization of STARS as a collective investment scheme under U.K. law. Monger, Tr. 1347-52; Watson, Tr. 3536-39; JX 287.

On September 19, 2004, InvestCo filed its U.S. Corporation Income Tax Return for the year ending December 31, 2003. Watson, Tr. 3596-99; JX 234.

E.   Implementation and Structure of BB&T STARS[7]

In marketing the STARS transaction, Barclays and BB&T used generic names to identify the various entities that would be used in setting up the STARS structure. The generic names were designed to be suggestive of the role that each entity would play in the structure. Thus, in the section below, following the promoter's naming convention, the Court will identify names such as InvestCo, Manager, NewCo, and DelCo. All of the necessary structure and entities were created within a span of one week. Monger Tr. 583.

The references to "Class A, B, C, D, and E Units" are simply nomenclature to describe ownership rights of the various entities and the transfers that would occur in the STARS transaction. Despite the many components and entities making up the STARS transaction, the real parties in interest at all times were BB&T Bank and Barclays Bank. The transaction also consists generally of a trust ("Trust") and a loan ("Loan").

---

[7]  The Court regrets the complexity of describing the STARS transaction. Government counsel rightly observed during his opening statement that STARS exhibits a "Byzantine complexity," and "in the annals of tax shelter history, there probably has never been a more complex transaction than the STARS transaction at issue in this litigation." Donohue, Tr. 37.

### 1.   Creation and Funding of the STARS Structure

Branch Investments LLC ("InvestCo") was a wholly owned subsidiary of BB&T. Stip. ¶ 4.  InvestCo was a pre-existing investment holding company formerly known as Skylight Investment Corporation, and was organized under the laws of the state of Delaware.  Stip. ¶¶ 4, 16.  On July 26, 2002, InvestCo formed Branch Management LLC, known as "Manager," a wholly owned Delaware corporation for U.S. federal income tax purposes.  Stip. ¶¶ 5, 11.  InvestCo acquired all of the issued and outstanding shares of Manager in exchange for $100,000 in cash.   Stip. ¶ 11.   BB&T retained control of Manager.  Cragg, Tr. 4461-62; USX 661 at 5.

On July 26, 2002, InvestCo also formed Branch Holdings LLC ("NewCo").  Stip. ¶ 12; JX 283 at 3897.  InvestCo organized NewCo as a wholly owned Delaware limited liability company.  JX 283 at 3897.  NewCo did not issue any membership interests until September 12, 2002.  Stip. ¶ 12; JX 283 at 3897.  BB&T retained control of NewCo. Cragg, Tr. 4460; USX 661 at 5.

Prior to executing STARS, BB&T held all of the common stock of Matewan Real Estate Holdings, Inc.  JX 283 at 3896.  On July 29, 2002, Matewan REIT executed an exchange of its common stock with BB&T.  Stip. ¶ 13.   On July 29, 2002, BB&T transferred 2,000 shares of its Class A Matewan REIT Stock in exchange for 2,000 shares of Class B REIT Stock.  Stip. ¶ 14; JX 283 at 3896.

On July 29, 2002, InvestCo converted to a limited liability company and changed its name from Skylight Investment Corporation to Branch Investments LLC.  Stip. ¶ 16; JX 283 at 3896.  InvestCo held $414 million in investment securities as of July 30, 2002. Stip. ¶ 17.  BB&T controlled InvestCo.  Cragg, Tr. 4460; USX 661 at 5.

On July 29 and 30, 2002, BB&T contributed approximately $5.755 billion in assets to InvestCo in exchange for additional common shares of InvestCo valued at $5.755 billion.  Stip. ¶ 18.  The assets contributed to InvestCo consisted of the Matewan Class B REIT Stock, automobile loans, constant credit loans, first deed loans, and other assets.  Stip. ¶¶ 15, 18.   At the conclusion of this step, InvestCo held approximately $6.169 billion in assets, consisting of $5.755 billion contributed from BB&T, and $414 million in investment securities already held by InvestCo.  Stip. ¶¶ 17, 19.

On July 30, 2002, InvestCo formed Branch Finance LLC, known as "DelCo." InvestCo contributed $6.080 billion in assets and $10,000 in cash to DelCo.  Stip. ¶ 20. In return, DelCo issued two classes of shares to InvestCo: (a) $65 million in Class I voting shares with rights to receive approximately 1 percent of any DelCo distributions; and (b) $6.015 billion in Class II non-voting shares with rights to receive approximately 99 percent of any DelCo distributions.  Id.  Thereafter, InvestCo owned all of the issued outstanding shares in DelCo.  Stip. ¶ 21.  DelCo owned $6.080 billion in income-

producing assets and $10,000 in cash transferred from BB&T via InvestCo. Stip. ¶ 22. BB&T controlled the DelCo distributions through its ownership of the Class I shares. Cragg, Tr. 4460; USX 661 at 5. Of the approximately $6 billion owned by DelCo, $1.5 billion served as collateral for the Loan, and the remaining $4.5 billion generated income for the required revenue stream. Johnson, Tr. 175-76.

Branch Funding Trust, known as "Trust," was established on July 30, 2002. Stip. ¶ 23; JX 283 at 3895. The Trust was 100 percent owned by InvestCo. Stip. ¶ 23. The Trust Agreement that created the Trust also delegated management and administration of the Trust to Manager, which was controlled by BB&T. Stip. ¶ 23; Cragg, Tr. 4461-62; USX 661 at 5.

On July 30, 2002, InvestCo contributed its DelCo Class II non-voting stock and $89 million in assets to the Trust. Stip. ¶ 24. In return, the Trust issued to InvestCo (a) the Class A Units with an aggregate stated value of $4.604 billion, and (b) the Class B Unit with a stated value of $1.5 billion. Id.; JX 283 at 3897-98.

On August 1, 2002, Barclays provided $1.5 billion in cash to the Trust in return for a Class C Unit with a stated value of $1,474,999,000, a Class D Unit with a stated value of $25 million, and a Class E Unit with a stated value of $1,000. Stip. ¶ 26. Despite the Barclays Unit purchase, BB&T retained control over the Trust. Cragg, Tr. 4461-62; USX 661 at 5. Also on August 1, 2002, using the cash received from Barclays, the Trust immediately redeemed InvestCo's Class B Unit for $1.5 billion in cash. Stip. ¶ 32. This step completed the transfer of $1.5 billion in financing from Barclays to the BB&T Group through the Trust. Id.

On the closing date of August 1, 2002, InvestCo transferred 50 percent of the Trust's Class A Units to NewCo in return for a 100 percent membership interest in NewCo. Id. ¶ 34. Contribution of 50 percent of the Class A Units in the Trust to NewCo created a second member in the Trust, allowing it to elect to be classified as a partnership for U.S. tax purposes. JX 283 at 3943.

On August 1, 2002, InvestCo issued preferred shares to Asteras (to be addressed below) in return for $65 million in cash. Stip. ¶ 30. Of the amount invested by Asteras, $64.75 million was loaned to Asteras by a wholly owned subsidiary of Barclays. Id. The remaining $250,000 came from an entity known as GSS Holdings. Cragg, Tr. 4554-55. Also on August 1, 2002, InvestCo loaned the proceeds from the Class B redemption ($1.5 billion) and the preferred stock issuance ($65 million) to two state-chartered BB&T banking subsidiaries, Branch Banking and Trust Company of Virginia and Branch Banking and Trust Company of South Carolina. Stip.¶ 33.

The Trust and DelCo each filed a form 8832 with the IRS, electing to be classified as partnerships for U.S. tax purposes. Id. ¶ 35. On August 2, 2002, Branch

Administrators Limited, also known as the U.K. Trustee ("Trustee"), was formed as a U.K. incorporated company established under the laws of England and Wales. Id. ¶ 36. In exchange for interests in the Trustee, InvestCo and DelCo funded the Trustee with $990,000 and $10,000 in cash, respectively. Id.

On August 8, 2002, the U.K. Trustee replaced the U.S. Trustee as the trustee of the Trust pursuant to the Trustee Accession Agreement. Id. ¶ 37. The U.K. residence of the Trustee made the income of the Trust subject to U.K. tax. Cragg, Tr. 4462; Demo. Ex. 15; USX 607 at 5. BB&T nevertheless retained control of the Trustee. USX 661 at 5. The Trustee's responsibilities were limited to administrative activities. Cragg, Tr. 4462-63; Demo. Ex. 13; JX 243 at 2394.

## 2.  Changing Barclays' Trust Unit Purchase Into a Collateralized Loan

Barclays and InvestCo executed two forward sale agreements (addressed below), including one related to the Class C and E Units, and the other related to the Class D Unit. Stip. ¶ 28. The combined effect of the forward sale agreements was that InvestCo agreed to purchase the Class C, D, and E Units from Barclays at the termination of the transaction for a price equal to the total original subscription amount of $1.5 billion, plus an amount calculated by reference to a fixed interest rate, known as the "accretion." Id. The forward sale agreements had a stated maturity date of August 15, 2007 (a term of approximately five years), but could be terminated by either party with 30 days' notice. Stip. ¶¶ 57-59. InvestCo's obligations to Barclays were collateralized by $2.14 billion in assets ($391 million in investment securities and $1.75 billion in auto loans). Stip. ¶¶ 53-56. In addition, BB&T guaranteed InvestCo's obligations to Barclays in the STARS transaction. Stip. ¶ 27.

Barclays and InvestCo also simultaneously executed a Zero Coupon Swap Agreement (addressed below), which effectively converted InvestCo's fixed-interest-rate obligation payable at termination pursuant to the Class C Unit and Class E Unit forward sale agreement into a floating rate interest obligation payable monthly. Stip. ¶ 29. This floating interest obligation was calculated as the product of (a) a notional principal amount of $1.475 billion and (b) a floating rate tied to the one-month LIBOR rate. Id. Also as part of the Zero Coupon Swap Agreement, the floating interest obligation was offset against a separate predetermined amount characterized in the closing documents as the "Floating Rate Spread Amount" or the "Bx." Id. The fixed leg of the Swap Agreement required Barclays to pay a fixed amount at termination, which was exactly equal to the accretion. Cragg, Tr. 4573-74; JX 20 at 431.

The accretion payment from BB&T to Barclays calculated by reference to the fixed interest rate contained in the Class C Unit and Class E Unit forward sale agreement was designed to be exactly offset by an identical payment from Barclays to BB&T in the Zero Coupon Swap Agreement. Cragg, Tr. 4571-74; Demo. Exs. 153-56. The net effect

of Barclays' purchase of Trust units, the forward sale agreements, and the Zero Coupon Swap Agreement was to provide BB&T with $1.5 billion in funding from Barclays at a floating rate of approximately one-month LIBOR plus 25 basis points, and the payment of a monthly "Bx" amount from Barclays to BB&T.  Cragg, Tr. 4577-78; Demo. Ex. 159.

### 3.  Cash Flows Associated With the STARS Structure

The Trust received 99 percent of the monthly distributions as the holder of DelCo's Class II ordinary stock, and InvestCo received one percent of the monthly distributions as the holder of DelCo's Class I ordinary stock.  Stip. ¶ 38.  InvestCo determined the magnitude of these distributions through its ownership of the DelCo Class I ordinary stock.  InvestCo could cause DelCo to make distributions in excess of its income, by distributing capital.  Stip. ¶ 20; Cragg, Tr. 4486; Demo. Ex. 48.  Each month, the Trust paid the Manager a fee to compensate the Manager for managing the assets of the Trust.  Stip. ¶ 50.

After payment of the Manager's fee, the remaining Trust income was subject to U.K. tax liability.  Stip. ¶ 39; Coffield, Tr. 4420-21.  These U.K. taxes were payable semi-annually at a rate of 22 percent.  Stip. ¶¶ 39, 63.  To pay these taxes in the United Kingdom, the Trust set aside a portion of the cash received (the "Tax Amount") each month in a tax set-aside account held at Barclays.  Stip. ¶ 39.  Since the Trust was required to pay tax in British pounds sterling while the cash received by the Trust was in U.S. dollars, the Trust exchanged the Tax Amount for an amount of British pounds sterling at the prevailing exchange rate.  Id.

After deducting the Manager fee and setting aside funds to pay the U.K. taxes, the Trust distributed its remaining cash to its unit holders pursuant to the Trust Agreement in the following order:  (1) Class A Units – one percent of the Trust's income (proceeds split evenly between InvestCo and NewCo, as each of those entities held 50 percent of the Class A Units); (2) Class D Unit – LIBOR-based distribution to Barclays based on the $25 million D Unit stated value; (3) Class C Unit – all remaining distributable income.  No distributions were made on the Class B Unit (which had been redeemed) and the Class E Unit (which had no distribution rights).  Stip. ¶¶ 32, 40.  The Class C Unit distribution was placed into the "Barclays Blocked Account," held in the name of Barclays at BB&T and described in the Bank Agreement.  JX 18.  The precise amount of the C Unit distributions was specified in the Class C Unit and Class E Unit forward sale agreement.  JX 23 at 478-80.  The C Unit distributions were approximately 99 percent of the Trust's remaining income after payment of the U.K. tax.  Cragg, Tr. 4495; Demo. Ex. 66.

At the time they entered into the STARS transaction, the parties agreed to a schedule of expected monthly Class C Unit distributions set forth in the Class C Unit and Class E Unit forward sale agreement.  Stip. ¶ 41; JX 23 at 478-80.  The Class C Unit

distributions were required to be paid each month into the Barclays Blocked Account at BB&T. Stip. ¶ 41. The amount of the monthly distribution ranged between approximately $25 million and $35 million. Cragg, Demo. Ex. 33. Barclays had no authority to withdraw funds from this account. Id. At the closing date, Barclays irrevocably directed that all funds paid into the Barclays Blocked Account be returned to the Trust on the same day (or as soon as practicable thereafter). Id. In every month the STARS transaction was in effect, the Class C Unit distribution was made in exactly the target amount, and these distributions were always returned to the Trust on the same day. Cragg, Tr. 4474-75; Demo. Ex. 36; Stip. ¶ 41. While the distributions differed somewhat from month to month, this variation is explained by the differing number of days across time periods. Cragg, Tr. 4473-74; Demo. Ex. 34.

Each month the Trust would distribute income to the Class D Unit holder (Barclays) equal to (one-month U.S. dollar LIBOR + 25 basis points) x 0.875 x $25,000,000 (the stated amount of the Class D Unit). Stip. ¶ 42.

Barclays was obligated, pursuant to the Class C Unit, Class D Unit and Class E Unit Subscription Agreement, to return all Class C Unit cash distributions received from the Trust back to the Trust via the Barclays Blocked Account. Stip. ¶ 43. These returns of funds were represented by the parties to be further investment in the Class E Unit. Id. However, further investments in the Class E Unit did not increase the Class E Unit distributions because the Class E Units were not entitled to Trust distributions, Stip. ¶ 40, and did not affect the price at which the Class E Unit would be repurchased by BB&T under the forward sale agreement. Cragg, Tr. 4497-99; JX 23 at 476. The Trust then took the returned Class C Unit distributions and purchased additional DelCo Class II shares. Cragg, Tr. 4500; USX 918 at 30-31. The Trust's increased investment in DelCo Class II shares did not increase its rights to DelCo distributions. Cragg, Tr. 4501; JX 7 at 111.

Under the forward sale agreements, InvestCo agreed at the termination of the STARS transaction to purchase, and Barclays agreed to sell, the C, D, and E Units at a predetermined price consisting of $1.5 billion plus a fixed amount. Stip. ¶ 44. The fixed amount was calculated by multiplying $1.5 billion by 4.43 percent (the five-year swap rate of 4.18 percent plus a spread of 25 basis points) less the Bx amount. Id. The parties simultaneously executed the Zero Coupon Swap Agreement that effectively converted BB&T's fixed-rate obligation payable at termination under the Class C Unit and Class E Unit forward sale agreement into a floating rate interest obligation payable monthly. Id. ¶ 45. Under the floating leg of the Zero Coupon Swap Agreement, Barclays received from InvestCo a variable payment calculated by multiplying $1.475 billion (the Class C stated value) by (one-month U.S. Dollar LIBOR + 25 basis points) minus the Bx (referred to in the Swap Confirmation as the "Floating Rate Spread Amount"). Id.

The parties agreed to a schedule of specific Bx payments at the inception of the transaction. Stip. ¶ 47. Over the expected 60-month period of the STARS transaction, the monthly Bx payment ranged from a low of $3,633,996 (month 7) to a high of $5,650,566 (month 1). Id.

Each month, InvestCo's floating interest obligation and Barclays' Bx obligation were netted against each other. Stip. ¶ 46. In instances where InvestCo's floating interest obligation exceeded Barclays' Bx obligation, InvestCo would make a payment to Barclays. Id. In instances where InvestCo's floating interest obligation was less than Barclays' Bx obligation, Barclays would make a payment to InvestCo. Id. From September 2002 until mid-2005 (nearly three years), Barclays made monthly payments to InvestCo under this agreement. Coffield, Tr. 4433-34; Stip. App. A. In 2003, the Barclays payments to InvestCo exceeded $25 million, and in 2004, they were more than $26 million. Stip. App. A. Banks, in making a loan, do not normally pay interest to the borrower. Monger, Tr. 1113.

Over the life of the transaction, InvestCo agreed to pay to Asteras quarterly dividend payments at a rate of one-month dollar LIBOR + 35 basis points multiplied by the $65 million stated value of its preferred stock. Stip. ¶ 49. Asteras was obligated to make payments to Barclays' subsidiary, Barclays Oversight Management, Inc. ("BOMI") at a rate of one-month dollar LIBOR + 24 basis points multiplied by $64,750,000, the amount Asteras had borrowed from BOMI to acquire the preferred shares. Id. The detailed spreadsheet used by the parties to analyze the STARS cash flows disregarded Asteras, and treated Barclays as the recipient of the preferred dividend. Cragg, Tr. 4555-56; Demo. Ex. 134.

The amount of Trust income placed into the U.K. tax set-aside account was used to pay U.K. taxes as they became due. Stip. ¶ 48. The Trust's payment of U.K. taxes generated the foreign tax credits claimed by BB&T. JX 241 at 187488. The Trustee, acting through the Manager in its management and administration capacity, made U.K. tax payments from the U.K. tax set-aside account to the U.K. taxing authority. Stip. ¶ 48. Pursuant to U.K. law, the Trust's taxable years ended on April 5 each calendar year, triggering the following events: (a) payment by January 31 of 50 percent of the estimated tax due for the year; (b) payment by July 31 of the remaining 50 percent of the estimated tax due for the year; and (c) payment by the following January 31 of the balance due, if any, as evidenced in the concurrently filed tax return. Id.

4. Loan

Barclays and BB&T created the $1.5 billion STARS Loan component with subscription agreements and two types of derivative contracts known as a forward sale agreement and a zero coupon swap, discussed above. JX 14; JX 19; JX 20; JX 23; JX 24; JX 36; JX 38. Barclays transferred $1.5 billion in cash to BB&T by means of the

subscription agreements at the beginning of the STARS transaction.  JX 14; JX 38.  On the August 1, 2002 closing date, Barclays subscribed for, or purchased, the STARS Trust's C, D, and E Units for $1.5 billion.  Cragg, Tr. 4466; Demo. Ex. 21; JX 2 at 9-10; JX 38.  By using this method, Barclays briefly placed the $1.5 billion in the Trust.  JX 38 at 855-56.  With this $1.5 billion, the parties put a value of $1,474,999,000 on the C Unit, a value of $25 million on the D Unit, and a value of $1,000 on the E Unit.  JX 2 at 9-10.

A forward sale agreement is an agreement to sell an asset at a future date for a price that is agreed to on the date of the agreement.  Kawaller, Tr. 4874.  Barclays and BB&T entered into two forward sale agreements:  (a) a Class C Unit and a Class E Unit Forward Sale Agreement, and (b) a Class D Unit Forward Sale Agreement.  Kawaller, Tr. 4873-74; JX 23 at 468-83; JX 24 at 484-94.  Under these agreements, Barclays committed to sell, and BB&T (through InvestCo) committed to buy the C, D, and E Units at the end of the STARS transaction.  Kawaller, Tr. 4884-85; JX 23 at 470; JX 24 at 486.

Although Barclays originally subscribed for these units from the Trust entity directly, Barclays agreed to forward sell the C and E Units at termination for $1.475 billion and agreed to forward sell the D Unit at termination for $25 million.  Kawaller, Tr. 4884-85; JX 2 at 9-10; JX 23 at 470; JX 24 at 486, 491.  InvestCo agreed to forward buy the C, D, and E Units for these amounts.  Id.  The Class C and E Unit Forward Sale Agreement did not discuss or recognize the mandatory return of the Class C Unit distributions each month, characterized as "reinvestments" in the Class E Unit, and did not allow for an increase in the sale price on the Class E Unit commensurate with these additional payments.  JX 2 at 11; JX 23 at 470; USX 918 at 36, 40.  This arrangement assured that at the end of the transaction Barclays would receive only the $1.5 billion that it originally put into the transaction.  Id.  The forward sale prices for the C, D, and E Units were due to Barclays at termination, when Barclays was to transfer these units to InvestCo.  JX 23 at 470; JX 24 at 486.

The Class C and E Unit Forward Sale Agreement formula calculated the accretion of interest on $1.475 billion at a fixed rate of 4.43 percent (composed of a swap rate of 4.18 percent plus a credit spread of 25 basis points), adjusted for the cumulative future value of Barclays' monthly Bx payments to BB&T.  James, Tr. 3798; JX 23 at 476; JX 36 at 721.  However, the parties never intended for this fixed interest rate to be paid.  Cragg, Tr. 4573-74; Demo. Exs. 155, 156.  Instead, the parties simultaneously entered into a Zero Coupon Swap, which Dr. Cragg concluded "has the effect of eliminating the accretion payment," by "exactly offsetting it."  Id.  As a result, the fixed rate accretion under the Class C and E Unit Forward Sale Agreement had no economic effect.  Cragg, Tr. 4573-75; Demo. Exs. 155-157; JX 36 at 725.

Because InvestCo paid the D Unit interest currently over the life of the STARS transaction, the forward sale price for that Unit was simply $25 million, the same as the initial acquisition price.  JX 24 at 491.  The forward sale payments for the C, D, and E

Units were due at termination, when Barclays was to transfer the units to InvestCo. JX 23 at 470, 472, 486-87. Although the Forward Sale Agreement for the C and E Units could have applied a variable rate of interest or scheduled the interest payments to be paid monthly, it did not. The parties simply did not need a swap to convert the forward sale's fixed interest rate to a variable interest rate. Kawaller, Tr. 4882. Rather, the parties used a simultaneously executed interest rate swap to set the actual interest rate to be paid each month at LIBOR + 25 basis points on $1.475 billion. Kawaller, Tr. 4884-85; Demo. Ex. 8. However, Barclays needed the fixed-payment accruing interest of the forward sale to make it appear that Barclays would suffer a predictable U.K. tax loss by its purported equity investments in the Trust's E Unit, which by design, did not return anything of value to Barclays. Monger, Tr. 649-50; Watson, Tr. 3546. Over the course of the transaction, Barclays would thus realize a U.K. tax loss because of how it priced the forward sale, namely that it had to increase the value of its investment in the Class E Unit of the Trust but had to sell back the Class E Units at a fixed price. Sultan, Dep. 52. Under U.K. tax law, Barclays was able to deduct this anticipated future loss. Monger, Tr. 649-50; Zailer, Tr. 2665-66; Demo. Ex. 2; USX 2215 at 20.

Under a typical interest rate swap, two parties agree to exchange payments, each calculated with reference to the same principal amount. Kawaller, Tr. 4876-77; Demo. Ex. 5. One party to the interest rate swap agrees to pay a variable rate on the principal amount, and the other party agrees to pay a fixed rate. Id. These two payment obligations are offset against each other, and the net difference is paid by one party or the other. Kawaller, Tr. 4878; JX 281 at 3903.

BB&T and Barclays entered into an interest rate swap agreement simultaneously with the forward sale agreements, known as the Zero Coupon Swap. JX 20; JX 23; JX 24. By this swap agreement, the parties replaced the lump sum accretion amount due at termination on the C and E Units into a series of monthly payments computed at a variable interest rate based upon LIBOR. Cragg, Tr. 4567; Demo. Ex. 147; JX 281 at 3903.

The fixed leg of the Zero Coupon Swap required Barclays to pay BB&T the net of (a) the accrued interest for the term of the STARS transaction, using a fixed rate of 4.43 percent on $1.475 billion, and (b) the cumulative future value of Barclays' monthly Bx payments to BB&T. Lys, Tr. 4217; JX 20 at 430; JX 36. This amount precisely equaled the accretion amount that InvestCo was obligated to pay Barclays under the Forward Sale Agreement in connection with the C and E Units. JX 23 at 476. As a result, Barclays' fixed rate accretion amount obligation under the Zero Coupon Swap cancelled out InvestCo's fixed rate accretion amount obligation under the C and E Unit Forward Sale Agreement, effectively negating the fixed interest rate component of the Forward Sale Agreement. Cragg, Tr. 4573-74; Demo. Ex. 155; JX 36 at 725.

Because the fixed rate accretion in the Forward Sale Agreement and the Zero Coupon Swap were designed to cancel each other out, the choice of 4.18 percent plus 25 basis points as the rate to be included in both of these agreements had "no commercial importance" and was entirely arbitrary.  Finard, Tr. 5048-49; USX 1479; USX 771.  The parties could have specified any number at all in place of the 4.18 percent, and the economics of STARS would not have changed.  Finard, Tr. 5048-49.

In addition, under the Zero Coupon Swap, InvestCo agreed to make monthly payments to Barclays on the same principal sum of $1.475 billion at the variable rate of LIBOR + 25 basis points.  Cragg, Tr. 4575; JX 20 at 432.  The cumulative effect was to replace InvestCo's fixed interest obligation under the Forward Sale Agreement with a variable interest obligation payable monthly.  Cragg, Tr. 4573-74; Demo. Ex. 155; JX 283 at 3903.  Thus, the net effect of combining the Forward Sale Agreement with the Zero Coupon Swap was that InvestCo paid Barclays interest at LIBOR + 25 basis points on $1.475 billion.  Cragg, Tr. 4573-74; Demo. Ex. 155.

Evaluating the net economic effect of the Loan therefore requires piecing together three agreements:  (1) the Class C, D, and E Unit Subscription Agreement, under which Barclays paid the Trust $1.475 billion for the C and E Units; (2) the Class C and E Unit Forward Sale Agreements under which InvestCo committed to purchase those units at termination for $1.475 billion plus an interest component of 4.43 percent each year; and (3) the Zero Coupon Swap, under which Barclays agreed to pay identically computed interest at 4.43 percent each year, and InvestCo agreed to pay monthly interest at LIBOR + 25 basis points.  Kawaller, Tr. 4884-85; Demo. Ex. 8; James, Tr. 3798; JX 2 at 8-11; JX 20; JX 23 at 476; JX 36 at 721; JX 38.

With the offsetting fixed-rate interest payments under the Zero Coupon Swap and the Forward Sale Agreement netting out to zero, and the remaining monthly interest payments by InvestCo to Barclays at LIBOR plus 25 basis points, the net effect of this structure's three agreements was that BB&T received $1.475 billion from Barclays at an interest rate of LIBOR + 25 basis points.  Kawaller, Tr. 4893-94; JX 20; Finard, Tr. 5047-48; Demo. Ex. 27.

## 5. Bx Payments From Barclays to BB&T

The Bx payment was the monthly payment that Barclays made to BB&T as part of the STARS transaction and constituted one of the key components of the transaction. The monthly Bx payments were listed in a schedule in the Amended and Restated Formulae Letter.  JX 36 at 721-22; Cragg, Tr. 4513-14; Demo. Ex. 96.  The Formulae Letter set forth the agreed interpretation of how the formulas would operate in the Forward Sale, Zero Coupon Swap and Trust Agreements.  JX 36 at 718-19.  The Formulae Letter contained the mathematical equation used to calculate the monthly Bx payments.  JX 36 at 724; Cragg, Tr. 4514; Demo. Ex. 97.

The June 2002 draft Formulae Letter stated: "BB&T's portion of the benefits under the transaction for each month (Bx in the Forward Sale and Zero Coupon Swap formulas) will be calculated before the Closing Date by the formula below," which references the specific Bx formula used in the BB&T STARS transaction. Cragg, Tr. 4516; JX 690 at 1398. As noted, it was important for the parties to fix the monthly Bx payments before closing to avoid potential withholding tax on the interest payments under the Zero Coupon Swap and the U.S./U.K. Double Taxation Treaty. Cragg, Tr. 4516-17; Demo. Ex. 101; USX 690 at 13.

The Bx payment formula was directly related to the amount of U.K. taxes paid by the Trust. From an economic perspective, the amount of the Bx monthly payment constituted a rebate of the U.K. taxes paid by the Trust. Cragg, Tr. 4517; Demo. Ex. 103. Barclays described the monthly Bx payments as a percentage of the U.K. taxes. In a February 16, 2002 memorandum to BB&T, Barclays' Mr. Sultan highlighted that the benefits from STARS were equal to 50 percent of the U.K. taxes. Mr. Sultan stated: "The benefit under STARS arises from the ability of both parties to obtain credits for the taxes paid in the trust. Thus, the benefits to both BB&T and Barclays are easy to calculate and are equal to 50 percent of these taxes for each party." JX 244 at 16419; Cragg, Tr. 4519-20; Demo. Ex. 105. KPMG also described the monthly Bx payments as a percentage of the U.K. taxes. In a January 2002 KPMG presentation to BB&T, KPMG emphasized that "BB&T obtains [a] rate reduction of 50 percent of UK tax, or $27 million." Cragg, Tr. 4520; Demo. Ex. 106; JX 239 at 11266.

The Formulae Letter defined the monthly Bx payments as a percentage of the U.K. taxes. This letter stated: "In words, Bx is equal to 51 percent of the tax credits received by Barclays on the Class C Unit . . . ." The Class C Unit constituted virtually all of the Trust's income. Cragg, Tr. 4520-21; Demo. Ex. 107; JX 36 at 724. Barclays referred to the monthly Bx payments as both a percent of the U.K. taxes and as a percent of Barclays' U.K. tax credit generated from the STARS transaction. Barclays used these terms interchangeably. Cragg, Tr. 4526; Demo. Ex. 109; JX 244 at 16419-20. KPMG also used the terms interchangeably. JX 239 at 11254.

The "floating rate spread amounts" in the Zero Coupon Swap were precisely the same values identified as the Bx in the Formulae Letter. The parties to the transaction used Bx and "floating rate spread amount" to describe the same cash flows. Cragg, Tr. 4584-86; Demo. Exs. 165, 166; JX 36 at 726.

Significantly, the Bx payments have no relationship to the amount of the Loan in the parties' modeling of the STARS transaction. Cragg, Tr. 4589-90, 4592-93; Finard, Tr. 5098-99; Demo. Ex. 65, 66; Ioannidis, Dep. 184. Barclays created a spreadsheet for the STARS model, and shared it with BB&T and other STARS' counterparties. Finard, Tr. 5086-87. The STARS model for the BB&T transaction had built-in parameters to

allow the parties to explore the impact of different relationships using four specific variables, which included the amount of the Loan. Finard, Tr. 5088-99; Demo. Ex. 57-66. The model also included a variable for the Bx payments. Id. The model permitted the parties to make projections of cash flows and to perform other calculations. Id. Application of the model demonstrated that when the amount of the STARS Loan was increased or lowered, there were no changes to the amounts of the monthly Bx payments, confirming that there was no relationship between the monthly Bx payments and the size of the STARS Loan. Cragg, Tr. 4590-93; Finard, Tr. 5088-99; Demo. Exs. 57-66. The amount of the Bx payment was determined solely by the amount of income that flowed through the Trust, which had no relation to the amount of the Loan. Cragg, Tr. 4593-94; Demo. Ex. 170; USX 1545 at 14. The Bx amount was calculated from a formula, which did not contain any mathematical term or symbol representing the STARS Loan. Cragg, Tr. 4595-96; Demo. Ex. 171; JX 36 at 724. The Loan had no connection with the Bx. Cragg, Tr. 4595-96.

### 6. U.K. Tax and Accounting Treatment

The U.K. tax treatment of the STARS transaction is highly complex, but results in substantial benefit to Barclays, BB&T, and the U.K. taxing authority, HMRC, all at the expense of the United States Treasury. At trial, the parties employed an example based upon the existence of $100 of Trust income.

Under section 469 ICTA[8] 1988, the Trustee paid income tax to HMRC at 22 percent, or $22 of the $100 Trust income, leaving the Trustee with $78 after the payment of U.K. income tax. Zailer, Tr. 2663-72. Under the same section, Barclays was treated as receiving a Trust distribution of $78, but the amount was grossed up for the U.K. income tax of $22 so that Barclays received a distribution of $100 and a tax credit of $22. Id. Because Barclays paid corporate tax at 30 percent, Barclays had to pay only $8 in tax, which is the difference between its corporate tax liability of $30, less the tax credit of $22. Id.

The Trustee distributed the after-tax amount of $78 to Barclays, and Barclays re-contributed the $78 back to the Trust. Id. Barclays then claimed a $78 tax deduction, which at a 30 percent tax rate, yielded a $23.40 tax benefit. Id. Barclays' tax liability of $8 could be eliminated using the $23.40 tax benefit from the deduction, leaving Barclays with a total tax benefit of $15.40 ($23.40 minus $8). Id. Under Barclays' agreement with BB&T, Barclays had to rebate to BB&T a portion of the $22 tax credit. Id. In marketing STARS to BB&T, the Barclays and KPMG promoters showed the rebate payment as 50 percent, or $11, although the parties ultimately agreed to a 51 percent rebate. PX 17 at 11223; USX 343 at 17; JX 36 at 724. Barclays deducted the $11 rebate payment, which, at a 30 percent corporate tax rate, yielded $3.30. The total tax benefit to

---

[8] "ICTA" refers to the U.K.'s Income and Corporation Taxes Act of 1988.

Barclays was $18.70 ($3.30 plus $15.40).  In economic terms, the benefit to Barclays was the U.K. tax benefit of $18.70, less the $11 rebate to BB&T, or a total of $7.70.  Peacock, Tr. 2205-06.  The percentage split between Barclays and BB&T is contained in the Formulae Letter, where the Bx payment is described as 51 percent of the $22 tax credit. JX 36.

The Trustee paid HMRC $22 in taxes, but because Barclays obtained an $18.70 U.K. tax benefit, the total tax collected by HMRC was $3.30 ($22 less $18.70).  Zailer, Tr. 2700-02.  Barclays itself did not pay U.K. tax as part of the STARS structure.  Id.

The U.K. tax treatment above makes the following assumptions:  (1) that the STARS Trust is an unauthorized unit trust whose Trustee is a U.K. resident for tax purposes; (2) that it is correct as a matter of U.K. law to treat Barclays as the holder of the Class C Unit; (3) that it is correct as a matter of U.K. law to treat Barclays as the recipient of the Class C Unit distributions;  and (4) that Barclays was entitled to claim a tax deduction for the re-contribution of $78 to the Trust.  Peacock, Tr. 2187-96.

Barclays assumed some risk that the HMRC would challenge the above assumptions, and if challenged, there was a risk that the challenge would be successful. Zailer, Tr. 2691-94; Demo. Ex. 9, 10.  A successful challenge would invalidate the intended STARS tax treatment, and Barclays' expected U.K. tax benefits under STARS. Zailer, Tr. 2691-92; Demo. Ex. 9.

7.  Transaction Features Designed to Minimize Barclays' Economic Risks

The Class C and Class E Unit Forward Sale Agreement contained a make-whole feature under which BB&T was obligated to reimburse Barclays if the credits generated by the Trust failed to match the parties' expectations.  Peacock, Tr. 2212; JX 23 at 472, 480; JX 36 at 840.  This provision provided safety to Barclays if there was less than full payment of U.K. taxes by the Trust:  ". . . this payment compensates Barclays if the Class C Unit distributions out of the trust (and hence the tax credits) are less than the agreed level."  Cragg, Tr. 4530-31; JX 36 at 841.  The make-whole payment would only be made to Barclays on the Class C and Class E Forward Sale Date, and therefore the make-whole payment also compensated Barclays for the time value of money.  JX 236..

If BB&T became obligated to reimburse Barclays under the make-whole provision, it would be making a direct payment to Barclays rather than a tax payment to the United Kingdom.  Cragg, Tr. 4533-34; JX 36 at 840-41.  In this circumstance, BB&T would be unable to claim foreign tax credits for the payment.  Cragg, Tr. 4534-35. BB&T had an economic incentive to ensure full and timely payment of U.K. tax on the Trust income.  Id.

The Amended and Restated Participation Agreement contained an indemnity provision that would be triggered if the Trust paid no tax because it was not a collective investment scheme, or if the Trustee was not a U.K. resident.  Cragg, Tr. 4543-44; JX 17 at 297.  BB&T's indemnity payment to Barclays would be approximately one-half of the U.K. tax that the Trust would have paid.  Cragg, Tr. 4545; JX 17 at 298-99.

The parties also negotiated at-will termination rights.  Johnson, Tr. 282-83; JX 23 at 472-73.  Under the Forward Sale Agreement, Barclays could terminate STARS for any reason with 30 days' notice.  JX 23 at 473.  If Barclays did not receive its anticipated tax benefits, it could have terminated the transaction.  USX 2219 at 14.  BB&T also could terminate STARS for any reason with 30 days' notice.  JX 23 at 472-73.  BB&T was well aware of this 30-day termination right.  Monger, Tr. 1063; Watson, Tr. 2867-68.  BB&T wanted sufficient time to replace the STARS Loan if it became necessary.  Monger, Tr. 730.

## 8.  Trust Income

Every month during the STARS transaction, BB&T targeted a pre-determined amount of money that it would briefly and nominally transfer to Barclays.  JX 23 at 478-80; USX 1972.  These transfers were to occur on the fifteenth day of each month.  Over the expected 60-month duration, the pre-determined monthly transfers averaged $31,332,400.  Id.  As noted, the amounts varied from month to month because of variations in the number of days per month and compounding asset income in the transaction.  Cragg, Tr. 4473-74.  BB&T transferred these amounts, known as the Class C Unit distributions, to the Barclays Blocked Account.  Monger, Tr. 653-54; Coffield, Tr. 4414; USX 1972, rows 253, 257; USX 1994 at 2.  A BB&T employee would make these Class C Unit distributions, and at the same time, would make another equal and opposite transfer from the Barclays' Blocked Account back to the original account.  Coffield, Tr. 4427; USX 1972, rows 250, 253, 256-57.  This latter transfer was known as the E Unit reinvestment.  Wild, Tr. 2625; USX 1972, rows 296-97.

The C Unit distribution amounts came from loan income held by BB&T's DelCo entity, known as Branch Finance LLC.  Coffield, Tr. 4398-99, 4412-13.  A BB&T employee reviewed the pre-determined Class C Unit distribution amounts monthly and calculated how much money to transfer from DelCo to make the distribution.  Coffield, Tr. 4414; USX 1988.  These distributions involved a simple chronological pattern:

- A payment from DelCo to the Trust;
- A payment from the Trust to the blocked account;
- A payment from the blocked account back to the Trust; and
- A payment from the Trust back to Delco.

Monger, Tr. 1007-08.  Logistically, all of these transfers took place during the same overnight process every month.  Coffield, Tr. 4430.

The purpose of exactly matching transfers to and from the blocked account was to create a trading loss for Barclays on its U.K. taxes.  Peacock, Tr. 2196; Wild, Tr. 2539-41.  The transfers made it appear that Barclays received STARS Trust income by the initial transfer to the blocked account, but then Barclays immediately and mandatorily "reinvested" the distributed amount into the Class E Unit.  Barclays then lost the "reinvested" contributions because it had to sell the E Unit back to BB&T for an amount equal to its initial capital contribution.  Peacock, Tr. 2196; Sultan, Dep. 106-07.  Barclays had no economic interest in the Class C Unit distributions and never intended to receive any benefits from these distributions aside from tax benefits.  Sultan, Dep. 122, 263; Abrahams, Dep. 48.  Nevertheless, Barclays took the position that U.K. tax law would respect the Class C Unit ownership because of the law's alleged recognition of form over substance.  Sultan, Dep. 122-23.

DelCo held the assets used in STARS, rather than the Trust, for U.K. tax reasons.  Wilkerson, Tr. 1808-09.  If the Trust had held the STARS assets, it might have exposed the assets to U.K. capital gains taxes and foreign currency gains taxes, neither of which would have produced a benefit for Barclays within the STARS structure.  Wilkerson, Tr. 1808-09; Lys, Tr. 4060.  Further, BB&T would have been required to reimburse Barclays for any U.K. tax that Barclays incurred on capital gains arising in the Trust.  USX 2215 at 54-56.  BB&T also recognized that it might not be able to claim foreign tax credits for any payment of a capital gains tax paid by the Trust.  Id.

In order to ensure that DelCo maintained a large enough pool of assets to make the monthly payment of the dividend on the Branch Finance Class II Shares, BB&T employees monitored the Loan assets in DelCo on a daily basis.  Coffield, Tr. 4397-98, 4401.  For example, if DelCo auto loans were paid off or otherwise retired, new assets had to be transferred to DelCo to maintain the necessary income levels.  Coffield, Tr. 4398-400; Finard, Tr. 5119.  This exercise involved determining what assets DelCo could purchase from the main BB&T North Carolina entity, and then internally selling those Loan assets from BB&T North Carolina to DelCo as necessary.  Coffield, Tr. 4399-400.

### 9.  STARS Submission to the North Carolina Commissioner of Banks

In the spring of 2002, BB&T informed the North Carolina Commissioner of Banks ("NCCOB") of the STARS transaction.  Hudson, Tr. 1565; JX 258; JX 268.  The NCCOB is the public regulator of North Carolina state-chartered banks.  The NCCOB is responsible for ensuring that North Carolina is served by banks that are able to meet the credit needs and other financial services of those within the state.  Smith, Tr. 2950.  A fundamental element of this responsibility is reviewing the "safety and soundness" of regulated banks, which consists of assessing a bank's capital, asset quality, management,

41

earnings, liquidity, and sensitivity to interest-rate risk. Smith, Tr. 2906-07. The NCCOB does not assist North Carolina chartered banks in complying with federal tax law. Smith, Tr. 2950. The NCCOB staff is not trained in federal tax law. Smith, Tr. 2920-22, 2952-53.

BB&T sought from the NCCOB a non-objection letter regarding STARS in order to secure the NCCOB's determination that the STARS entities would be considered operating subsidiaries under North Carolina law. Smith, Tr. 2928-29. BB&T's purpose essentially was to obtain the NCCOB's permission to form the STARS entities. Hudson, Tr. 1565-66. If BB&T had not taken this step, and if the NCCOB later had determined that, under North Carolina law, the STARS entities were subsidiaries engaged in non-banking activities, the consequences to BB&T would have been "significant." Smith, Tr. 2967-68; Hudson, Tr. 1476.

BB&T's in-house counsel, Howard Hudson, sent the NCCOB a letter dated April 11, 2002 that discussed STARS as "making available to BB&T over the next five years cost effective funding of $1.5 billion at approximately 300 basis points below BB&T's normal funding cost on an underlying asset pool of $7.2 billion." JX 258 at 1. This letter described STARS "as somewhat complex in nature," and BB&T offered to make Mr. Watson and Mr. Monger available to explain STARS to the NCCOB staff. Id. BB&T intended to give the NCCOB a preliminary tutorial on STARS before formally seeking non-objection. Hudson, Tr. 1476. In approaching the NCCOB, BB&T did not mention a sharing of U.K. tax benefits with Barclays, or that the low financing was made possible by claiming foreign tax credits in the United States. Smith, Tr. 2954-58; JX 258.

On April 23, 2002, the NCCOB's Daniel Garner requested a conference call with BB&T, and asked that BB&T assume "they are talking to a college student taking an accounting class, and then walk[ing] [NCCOB] through it at that level." JX 263. Shortly thereafter, BB&T executives met with Daniel Garner and others at NCCOB to provide them with an overall briefing about STARS. Hudson, Tr. 1560. During the briefing, BB&T did not describe the C Unit distribution and the corresponding E Unit re-contribution as a circular cash flow. Smith, Tr. 2962-63. Before STARS, Mr. Smith had not heard of a financing transaction with an interest rate of 300 basis points below LIBOR, and he never fully understood how Barclays was able to offer below-LIBOR financing to BB&T via the STARS transaction. Smith, Tr. 2959, 2961.

By letter dated June 5, 2002, BB&T formally sought non-objection from the NCCOB regarding the STARS entities. JX 268. In that letter, BB&T described STARS as "a synthetic financing transaction under which BB&T will borrow approximately $1.5 billion from Barclays . . . . The primary benefit of the Financing Transaction is that the interest rate payable by BB&T will be at an effective rate of 290 basis points below BB&T's normal cost of funds . . . ." Id. According to this letter, such a benefit was

"predicated on interpretations of both United States and United Kingdom tax laws and regulations." Id.

On June 6, 2002, the NCCOB informally indicated to BB&T its non-objection to the STARS entities.  USX 667.  By letter dated June 14, 2002, the NCCOB formally provided to BB&T such non-objection.  JX 270.  The NCCOB issued the formal non-objection letter with the understanding that BB&T would "obtain opinion letters as outlined in the application . . . and attempt to insure that the activities of . . . the agents, employees, and affiliates . . . that may be taken on behalf of the Bank shall comply with all applicable federal, state, and local laws and regulations."  Id. at 13509.  The non-objection letter also stated it was not an endorsement of STARS, but rather, was merely a statement by NCCOB that the STARS entities did not appear to pose a threat to BB&T's "safety and soundness."  Id.

The NCCOB never independently analyzed the tax treatment of BB&T's STARS transaction, and never sought a third-party analysis for this purpose.  Smith, Tr. 2959-60.  The NCCOB relied on BB&T's assurance in its formal request for non-objection that BB&T would receive written tax opinions from both Sidley Austin and KPMG regarding STARS' tax effects.  Smith, Tr. 2960; JX 268.   During his tenure as NCCOB Commissioner, Mr. Smith personally wanted BB&T to become the largest state-chartered bank in the United States.  Smith, Tr. 2948-50.

F.  Possible Second STARS Transaction

Starting in June 2003, various newspaper stories were published regarding KPMG, Sidley Austin and Mr. Ruble, and their role in allegedly improper tax shelters.  See USX 1296; USX 1453; USX 1475.[9]  On or about October 2003, Mr. Monger knew that Sidley Austin had terminated Mr. Ruble, and discussed that fact with Messrs. Hudson and Reed.  Monger, Tr. 1372-74.  At some time in 2003 or 2004, Mr. Watson and other executives at BB&T learned that KPMG, Mr. Ruble, and Sidley Austin were all under scrutiny for tax shelter activity.  Watson, Tr. 3553-55.   Although KPMG and Sidley Austin were receiving negative publicity regarding abusive tax shelters, Barclays pitched a second STARS transaction to BB&T.  Watson, 3559-60.

By April 15, 2004, there was a pending IRS audit of BB&T's listed transactions from 1998-2002, which included STARS.  USX 1601.  In an internal Barclays email sent that day, Mr. Ioannidis stated that Mr. Monger "does not want to be expanding a trade

---

[9] These articles, published in *The Wall Street Journal* and *The Chicago Tribune*, were titled "KPMG's Emails Pointed to Concerns Over Tax Shelters," "U.S. Government Sues Sidley Austin On Tax Shelters," and "Sidley Austin expels partner; Played key role in tax shelters."   Mr. Monger testified that he dismissed these articles as "probably inflammatory, probably highly erroneous, [and] obviously slanted," and observed that "[a]nybody that depends on the newspaper, I think, is being rather short-sighted."  Monger, Tr. 1387.

which is currently under IRS review." Id.; Monger, Tr. 1363-68; Watson, Tr. 3561-63. Despite this pending audit, in mid-May 2004, BB&T was considering extending its STARS transaction. USX 1623. The following month, Barclays presented a proposal to BB&T regarding "Additional STARS Financing." USX 1623; Watson, Tr. 3558-60.

By August 2004, BB&T executives knew that Mr. Ruble and Sidley Austin were under investigation by the federal government, and that Mr. Ruble had been represented in the media as blessing tax shelter products of KPMG. Monger, Tr. 1382-85. After learning this information, BB&T requested and received assurances from Sidley Austin that the law firm would stand behind its STARS opinions. Id. at 1385-86.

Mr. Monger retired in October 2004, and Mr. Watson took over his position as STARS project director at BB&T. Watson, Tr. 3576-77. On April 6, 2006, Mr. Watson attended a meeting of the Trustee's Board of Directors. USX 1855 at 2; Watson, Tr. 3579-81. At this meeting, Mr. Watson indicated to the directors that BB&T was interested in extending the STARS transaction. USX 1855 at 2; Watson, Tr. 3579-81. On May 11, 2006, the managers of InvestCo held their annual meeting, at which they adopted a resolution authorizing action to extend STARS. USX 1865; Watson, Tr. 3581-82.

Internal KPMG email correspondence dated May 18, 2006 discussed a potential extension of the STARS transaction with BB&T. USX 1869; Watson, Tr. 3576-79. The email explained that "[t]hey've [BB&T] been briefed about the potential impending bad publicity and been advised to consider diversifying their risk by looking at other strategies and counterparts. They seem to be undaunted and want to proceed." USX 1869. As late as June 15, 2006, BB&T was considering an extension of the STARS transaction of up to five years. JX 272; USX 1879.

In November 2006, the IRS issued three Information Document Requests ("IDRs") to BB&T related to the STARS transaction and the entities used to implement it. USX 1908-10; Watson, Tr. 3584-86. The IRS issued three additional IDRs to BB&T related to the STARS transaction in December 2006. USX 1923-25; Watson, Tr. 3586-88. In January 2007, a federal court decided against BB&T in litigation involving BB&T's LILO transactions, which resulted in a significant tax impact to BB&T. BB&T Corp. v. United States, 2007 WL 37798 (M.D.N.C. 2007); Watson, Tr. 3588-89.

G. Termination of BB&T STARS

Mr. Watson recognized that BB&T may need to terminate STARS early, in the event of an IRS challenge to the transaction or a change in U.S. or U.K. tax law. Watson, Tr. 3471. On March 30, 2007, the IRS published its proposed "Regulations on Transactions Designed to Artificially Generate Foreign Tax Credits." 72 FR 15081, REG-156779-06, March 30, 2007. Some of KPMG's clients terminated STARS because

of the effect of these proposed Treasury regulations on their ability to claim foreign tax credits for the STARS transaction.  Wilkerson, Tr. 1863.

BB&T terminated its STARS transaction as of April 5, 2007.  Stip. ¶ 86; JX 168-171; JX 184; JX 193-201.  Representatives of BB&T testified at trial that BB&T terminated STARS because it believed a potential change in U.K. tax law might cause Barclays to terminate STARS, and wanted to "terminate it at a good time for us [BB&T] to get financing somewhere else in the market."  Allison, Tr. 825; Watson, Tr. 2867-70.

To terminate the STARS transaction, InvestCo purchased Barclays' C and E Units by paying Barclays $1,479,680,507.  InvestCo purchased Barclays' D Unit by paying $25,079,340.  Stip. ¶ 87.  Because the transaction was not terminated on a regular monthly STARS payment date, InvestCo had to pay mid-month interest:  an additional $4,680,507 over the principal amount for the C and E Units, and an additional $79,340 over the principal amount for the D Unit.  JX 36.  Through these payments, InvestCo repaid the principal amount of the STARS transaction financing.  Stip. ¶ 88.  The Asteras preferred shares remained outstanding until June 15, 2007, at which time InvestCo redeemed the $65 million in preferred shares issued to Asteras.  Stip. ¶ 89.

## H.  Costs and Fees of BB&T STARS

### 1.  Third Party Fees

As discussed above, KPMG and BB&T negotiated and agreed to a fixed fee of $6.5 million, plus hourly assistance.  JX 254.  Of that amount, $500,000 would be deferred for each of the five projected years of STARS.  Monger, Tr. 1196; JX 254.  Mr. Monger also negotiated with KMPG that it would render a minimum amount of services for no fee in the event of an IRS audit of the STARS transaction, not to exceed 350 hours.  USX 470; Monger, Tr. 1156-1157; Watson, Tr. 3471-73, 3622-25; JX 254.  Fees for examination assistance in excess of 350 hours were to be billed at mutually agreeable rates.  JX 264.  The $6.5 million in fees was "by a significant margin" the most that BB&T had ever paid for a "tax solution."  Monger, Tr. 1191; USX 2238 at 1-2.

Also as discussed above, BB&T retained the law firm of Sidley Austin to assist in tax matters.  Monger, Tr. 1295; JX 243.  Sidley Austin was to receive a flat fee of $300,000 for tax matters, and monthly billing at the firm's standard rate for any corporate law work.  JX 243 at ¶ 3.  BB&T paid a total of $1,355,929.91 to Sidley Austin for its various legal opinions and other advice provided with the transaction.  USX 679 at 1, 4; USX 937 at 1-3; USX 1115; USX 1587; USX 1966; USX 2096.  The total fees that BB&T paid to KPMG and Sidley Austin represented "52 or 53 basis points" on the $1.5 billion financing.  Monger, Tr. 699.

BB&T incurred fees for services rendered by PwC with respect to the STARS transaction from March 16, 2002 through May 15, 2003.  BB&T paid PwC a total amount of $117,085.  USX 591.

BB&T did not pay Barclays a direct fee for its participation in the transaction.  LaRue, Tr. 5322.

### 2.  Internal Administrative Costs

BB&T executives and employees expended considerable time and resources reviewing and implementing STARS.  Monger, Tr. 602; Allison, Tr. 894.  Once BB&T entered into the STARS transaction, the BB&T general accounting department employed many steps to implement the transaction processes, some of which could take up to seven hours a day.  Coffield, Tr. 4397-440.

The STARS Trust structure also required expenditures within BB&T.  USX 2212 at 54-55.  The Trust structure required the payment of administrative costs and fees, some of which would not have been incurred if not for the transaction.  Id. at 54.  Over the life of the transaction, the Trust would have service fees of $2.2 million.  Id..  BB&T also anticipated costs for incremental operating expenses, such as "salaries, benefits & other expenses," as well as travel costs, amounting to $87,000 annually.  USX 933 at 5; USX 2212 at 54.  Additionally, special purpose entities created specifically for the transaction required management fees possibly in excess of $2.6 million.  USX 2211 at 16; USX 2212 at 54-55, 106, 116-117.

### I.  Expert Witnesses

Thirteen expert witnesses testified at trial, seven called by BB&T and six called by the Government.  The expert witnesses for BB&T were:  (1) Mr. William Isaac, an expert in banking oversight and management; (2) Dr. Christopher James, an expert in banking and finance; (3) Dr. Thomas Lys, an expert in economics; (4) Mr. David Rosenbloom, an expert in international tax; (5) Mr. Jonathan Peacock, an expert in U.K. tax law; (6) Mr. Martin Brooks, an expert in U.K. tax administration; and (7) Mr. Kenneth Wild, an expert in U.K. accounting.  The Government's experts were:  (1) Dr. Michael Cragg, an expert in economics and financial analysis; (2) Mr. Joel Finard, an expert in capital market analysis and structured finance analysis; (3) Dr. Ira Kawaller, an expert in economics and the use of derivative contracts; (4) Dr. David LaRue, an expert in economics, accounting and tax compliance; (5) Mr. Isaac Zailer, an expert in U.K. tax law; and (6) Mr. Michael Taub, an expert in U.K. accounting.  While all of the experts were helpful to the Court in varying degrees, Dr. Cragg for the Government was the single most helpful expert in providing a comprehensive analysis of the STARS transaction.

Dr. Cragg analyzed the source of benefits in the STARS transaction.  He testified that the benefits of STARS arose solely from artificially created U.K. taxes and foreign

tax credits. He concluded that, as an economic matter, BB&T's voluntary action of subjecting its U.S.-sourced income to a U.K. tax was the source of the financial benefits to both BB&T and Barclays from STARS. Cragg, Tr. 4548-52. He noted that in return for BB&T circulating its income through a Delaware trust with a U.K. trustee, which subjected the income to a U.K. tax, Barclays agreed to make monthly payments labeled as the "Bx" to BB&T. Id. at 4463. The Bx payment represented a return or rebate by Barclays of 51 percent of the U.K. tax paid by BB&T. Id. at 4517; Demo. Ex. 103. By voluntarily paying U.K. taxes on U.S.-sourced income, BB&T was thereby able to claim U.S. foreign tax credits. Cragg, Tr. 4548-52.

Dr. Cragg also testified that the Bx payment was purely a tax effect and could not be considered a component of interest. Id. at 4583-84, 4601. His economic analysis showed that the netting of the Bx payments from Barclays with the monthly interest payments on the Loan resulted in an interest rate of approximately 300 basis points below LIBOR. Id. at 4588-89; Demo. Ex. 168. He observed that the netting of these two payment obligations could be expected to result in a "negative interest rate" owed by BB&T. Cragg, Tr. 4632; USX 2212 at 60-62. For the first 35 months of the Loan, the lender, Barclays, was paying the borrower, BB&T, to borrow its funds. Dr. Kawaller testified that it makes no economic sense for a lender to pay a borrower. Kawaller, Tr. 4632.

Dr. Cragg also demonstrated that the STARS Trust structure consisted of a series of economically meaningless circular cash flows, and that the STARS Trust was separable from the Loan and had no economic purpose. Cragg, Tr. 4493-94, 4658; Demo. Exs. 215-220. He showed that the Trust was artificially combined with the Loan, which, excluding the U.S. tax benefits derived from STARS, was high-cost relative to BB&T's alternative funding opportunities. Cragg, Tr. 4646-48; Demo. Ex. 205-206. According to Dr. Cragg, neither the Loan, nor the Trust, nor the combination of the two offered any possibility of non-tax profit for BB&T. Cragg, Tr. 4648-49, 4610, 4671-72; Demo. Exs. 179, 181, 208. Dr. Cragg demonstrated that ultimately the sole purpose of STARS was to transfer more than $400 million from the U.S. Treasury to BB&T, Barclays, and the U.K. tax authority. Cragg, Tr. 4680; Demo. Ex. 230.

Mr. Finard testified that BB&T's stated business purposes for the STARS transaction were not consistent with the transaction's financial risks and rewards. Mr. Finard's capital markets analysis showed that STARS was not low-cost funding and that it did not provide liquidity risk management benefits. Finard, Tr. 5125, 5141; Demo. Ex. 80, 91. Mr. Finard concluded that, once stripped of its needless complexity, STARS consisted of two, simple unrelated transactions – the Loan and the Trust. The two components were artificially linked to enable BB&T to deduct U.S. tax benefits generated by the Trust structure from the cost of the Loan, thereby making the Loan appear to be low-cost funding. Finard, Tr. 5038-39, 5081-82, 5146-48; Demo. Ex. 19-21, 97-98.

Dr. Kawaller's analysis of the cash flows of STARS demonstrated that the Bx payments were a rebate of taxes, not an interest expense, and should not be considered in a pre-tax profitability analysis. Kawaller, Tr. 4898-900. He established that when the Bx payments were excluded, the STARS transaction was not profitable for BB&T. Id. at 4924-25.

Like Mr. Finard, Dr. LaRue determined that, from an economic and analytical perspective, the STARS transaction consisted of two functionally unrelated and discrete components, the Trust and the Loan. LaRue, Tr. 5286; Demo. Ex. 3-5. Dr. LaRue's analysis of the Trust structure demonstrated that the Trust was not intrinsically capable of generating any pre-tax economic profit. Although BB&T incurred substantial transaction costs in establishing the Trust, the only economic benefits were from the tax rebates. LaRue, Tr. 5306-08; Demo. Ex. 16-17.

Mr. Zailer testified about the risk that the U.K. tax authority would challenge the STARS transaction. Zailer, Tr. 2694. He observed that HMRC would most likely challenge a transaction when it loses money, not where it gains revenue, such as in STARS. Id. at 2725-29. Barclays' correspondence with HMRC was misleading because it suggested that Barclays was paying the extra tax. In fact, the extra revenue to HMRC was a residual payment from the Trustee. Id. at 2701-02.

Mr. Taub's analysis demonstrated that Barclays was not in compliance with U.K. Generally Accepted Accounting Principles ("GAAP") in its financial reporting of STARS. In particular, Barclays inappropriately accounted for the income on the monthly C Unit distributions because the funds were simply part of a circular flow of funds having no economic reality. Taub, Tr. 2591-92, 2606; Demo. Ex. 10-11, 21; USX 2214 at 9.

Among Plaintiff's experts, Dr. Lys testified that STARS generated pre-tax profit for BB&T based on the assumption that the assets purchased by BB&T with the STARS proceeds were incremental. Lys, Tr. 4110-11. However, BB&T would have borrowed from other sources in the absence of STARS. Dr. Lys calculates the profitability of STARS as the return on the Loan proceeds, id. at 4109-11, but this testimony overlooks that BB&T would have had "loan proceeds" from any loan. This fact alone cannot provide a non-tax business purpose for the STARS transaction. The testimony of Dr. James suffers from the same shortcoming. James, Tr. 3633-36.

Mr. Isaac viewed STARS as low-cost funding that was strategically important to BB&T because it improved the bank's liquidity, provided greater loan diversity through international funding, and helped to fund the bank's asset growth. Isaac, Tr. 3256-57. However, the evidentiary record does not contain a single contemporaneous reference to these purported benefits except for the low-cost funding. Id. at 3390-91. Indeed, the record reflects that BB&T could have borrowed from other sources, such as the Federal

Home Loan Bank Board ("FHLB"), at favorable loan rates. The unusually low financing created under STARS is made possible purely by the rebate of U.K. taxes. The Court commends Plaintiff's experts for their ingenuity, but no matter how one holds the STARS prism to the light, the benefits are driven solely by the sham circular cash flows of the Trust.

## II.   Discussion

### A.   Standards for Decision

A tax refund suit is a *de novo* proceeding, "not an appellate review of the administrative decision that was made by the IRS[.]" Wells Fargo & Co. v. United States, 91 Fed. Cl. 35, 75 (2010) (quoting D'Avanzo v. United States, 54 Fed. Cl. 183, 186 (2002)), *aff'd*, 641 F.3d 1319 (Fed. Cir. 2011). Thus, in conducting its *de novo* review, the Court gives "no weight . . . to subsidiary factual findings made by the [IRS] in its internal administrative proceedings." Id. (quoting Cook v. United States, 46 Fed. Cl. 110, 113 (2000)).

In addition, the plaintiff in a tax refund suit bears the burden of proving that it has overpaid its taxes for the year in question in the exact amount of the refund sought. Id. (citing, *inter alia*, Lewis v. Reynolds, 284 U.S. 281 (1932); Dysart v. United States, 169 Ct. Cl. 276, 340 F.2d 624 (1965)). This burden includes "both the burden of going forward and the burden of persuasion," Sara Lee Corp. v. United States, 29 Fed. Cl. 330, 334 (1993)), and must be met by a preponderance of the evidence, Ebert v. United States, 66 Fed. Cl. 287, 291 (2005). Accordingly, in order to fully or partially prevail in this suit, Plaintiff must demonstrate, by a preponderance of the evidence, its entitlement to the specific amount of the tax refund at issue.

### B.   Treatment of U.S. Foreign Tax Credits

The United States taxes the income of its citizens, residents, and domestic entities on a worldwide basis – *i.e.*, regardless of whether the income is earned domestically or internationally. Thus, a domestic corporation must include foreign source income on its U.S. tax returns even though that income may also have been subject to foreign taxation. Since 1918, however, the United States has allowed domestic taxpayers in this circumstance to claim a dollar-for-dollar credit in the U.S. for income taxes they have paid in a foreign country. Revenue Act of 1918, Pub. L. No. 65-245, § 238(a), 40 Stat. 1057, 1080-81; current codification at 26 U.S.C. §§ 27, 901.

As courts consistently have recognized, the purpose of the foreign tax credit is to allow taxpayers to avoid double taxation on foreign income, and thus to "neutralize the effect of U.S. tax on the business decision of where to conduct business activities most productively." Bank of New York, 140 T.C. at 46; see also United States v. Goodyear

Tire & Rubber Co., 493 U.S. 132, 139 (1980) (noting that the history of the credit "clearly demonstrates" that it was intended to eliminate "double taxation"); Am. Chicle Co. v. United States, 316 U.S. 450, 451 (1942); Burnet v. Chicago Portrait Co., 285 U.S. 1, 7 (1932); Guardian Indus. Corp. v. United States, 477 F.3d 1368, 1374 (Fed. Cir. 2007); 56 Cong. Rec. App. 677-78 (1918) (statement of Rep. Kitchin); Joint Committee on Taxation, The Impact of International Tax Reform: Background and Selected Issues Relating to U.S. International Tax Rules and the Competitiveness of U.S. Businesses (JCX-22-06) (noting that "[a] resident has no incentive under a worldwide [tax] system either to move activities abroad or to keep them within the residence country. . . . Thus, investment-location decisions [by U.S. citizens, residents, and corporations] are governed by business considerations, instead of by tax law.").

The purpose of the foreign tax credit is to permit substantive business decisions to be made largely independent of the tax consequences of the United States' worldwide system of taxation. Accordingly, it is well established that a taxpayer may structure its business transactions so as to minimize its tax liability. Helvering v. Gregory, 69 F.2d 809, 810 (2d Cir. 1934) ("Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes.") (Learned Hand, J.), aff'd, Gregory v. Helvering, 293 U.S. 465 (1935); Boulware v. United States, 552 U.S. 421, 429 n.7 (2008). Balancing this principle is the recognition that even if a transaction complies literally with the provisions of the Internal Revenue Code, it does not necessarily follow that Congress intended to cover every foreign transaction and allow a tax benefit. Bank of New York, 140 T.C. at 31 (citing, inter alia, Knetsch v. United States, 364 U.S. 361, 365 (1960)). Instead, the determinative question when assessing whether a party is entitled to particular tax benefit is "'whether what was done, apart from the tax motive, was the thing which the statute [creating the benefit] intended.'" Knetsch, 364 U.S. at 365 (quoting Gregory v. Helvering, 293 U.S. 465, 469 (1935)). This substance-based analysis has spawned various judicial doctrines, such as the economic substance doctrine, that prevent the recognition of benefits from abusive tax shelters.

The economic substance doctrine provides that technical compliance with the tax code notwithstanding, a taxpayer bears the burden of demonstrating that a given transaction carries both (1) the objective possibility of realizing a pre-tax profit (objective economic substance), and (2) a non-tax business purpose (subjective economic substance). Wells Fargo, 91 Fed. Cl. at 81 (citing Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1352 (Fed. Cir. 2006)); Stobie Creek Investments LLC v. United States, 608 F.3d 1366, 1375 (Fed. Cir. 2010). This doctrine "seeks to distinguish between structuring a real transaction in a particular way to obtain a tax benefit, which is legitimate, and creating a transaction to generate a tax benefit, which is illegitimate." Stobie Creek, 608 F.3d at 1375 (internal citations omitted) (emphasis in original).

50

In <u>ASA Investerings Partnership v. Commissioner of Internal Revenue</u>, 201 F.3d 505 (D.C. Cir. 2000), the D.C. Circuit eloquently described the requirement for a non-tax "business purpose:"

> It is uniformly recognized that taxpayers are entitled to structure their transactions in such a way as to minimize tax. When the business purpose doctrine is violated, such structuring is deemed to have gotten out of hand, to have been carried to such extreme lengths that the business purpose is no more than a facade. But there is no absolutely clear line between the two. Yet the doctrine seems essential. A tax system of rather high rates gives a multitude of clever individuals in the private sector powerful incentives to game the system. Even the smartest drafters of legislation and regulation cannot be expected to anticipate every device. The business purpose doctrine reduces the incentive to engage in such essentially wasteful activity, and in addition helps achieve reasonable equity among taxpayers who are similarly situated – in every respect except for differing investments in tax avoidance.

<u>ASA Investerings</u>, 201 F.3d at 513.

The economic substance doctrine applies in equal force to foreign tax credits. Courts have considered the specific issue of whether the substance doctrines apply to the availability of foreign tax credits, and have ruled in the affirmative.[10] Indeed, the Tax Court recently applied the economic substance doctrine to a similar STARS transaction between Barclays and the Bank of New York. Emphasizing that the purpose of the foreign tax credit is to "alleviate double taxation arising from foreign business operations," the court in <u>Bank of New York</u> held that:

> [t]he STARS transaction was a complicated scheme centered around arbitraging domestic and foreign tax law inconsistencies. The U.K. taxes at issue did not arise from any substantive foreign activity. Indeed, they were produced though pre-arranged circular flows from assets held, controlled and managed within the United States. We

---

[10] <u>See</u> <u>Bank of New York</u>, 140 T.C. 15, at 46-47; <u>Am. Int'l Grp., Inc. v. United States</u>, No. 09-1871, 2013 WL 1286193, *4-5 (S.D.N.Y. March 29, 2013) ("<u>AIG</u>"); <u>Wells Fargo v. United States</u>, No. 09-2764 (D. Minn. June 14, 2013); <u>Pritired 1, LLC v. United States</u>, 816 F. Supp. 2d 693, 740-41 (S.D. Iowa 2011); <u>see also</u> <u>IES Indus., Inc. v. United States</u>, 253 F.3d 350, 353-54 (8th Cir. 2001); <u>Compaq Computer Corp. v. Comm'r</u>, 113 T.C. 214, 225 (1999).

> conclude that Congress did not intend to provide foreign tax credits for transactions such as STARS.

140 T.C. at 46-47.  Similarly, the Southern District of New York also recently applied the economic substance doctrine to disallow a claim for foreign tax credits in <u>AIG</u>:

> Because Congress created the foreign tax credit for the taxpayer "who desires to engage in purposive activity," and sought only to eliminate the disadvantage to his foreign business imposed by U.S. taxation of worldwide income, it appears not to have intended the credit be available to transactions "that have no economic utility and that would not be engaged in but for the system of taxes imposed by Congress" simply because the transaction caused the taxpayer to pay foreign tax.

2013 WL 1286193, at *4(citation omitted)  (quoting <u>Goldstein v. Comm'r</u>, 364 F.2d 734, 741, 742 (2d Cir. 1966)).

The application of the economic substance doctrine to foreign tax credits is fully consonant with the purpose behind such credits: to establish neutrality through the elimination of double taxation that would arise in the absence of foreign tax credits. Thus, the requirements of the economic substance doctrine – namely, that a transaction be pre-tax profitable and have a non-tax business purpose – are fully compatible with the foreign tax credit regime.  See <u>AIG</u>, 2013 WL 1286193, at *3 ("Congress intended the [foreign tax] credit to facilitate purposive business transactions, not by subsidy, but by restoring the neutrality of the tax system."); <u>Pritired</u>, 816 F. Supp. 2d at 741 ("[Foreign tax credits] are available to *prevent* double-taxation, not to generate an enhanced return on the basis of structuring transactions to increase the available [foreign tax credits].") (emphasis in original).  Accordingly, there is no foreign tax credit exception to the economic substance doctrine.

## C. Economic Substance of STARS

As noted above, a taxpayer bears the burden of proving that the challenged transaction had (1) objective economic substance and (2) a non-tax business purpose. <u>Wells Fargo</u>, 91 Fed. Cl. at 81 (citing, *inter alia*, <u>Coltec</u>, 454 F.3d at 1355-56).  The objective inquiry focuses on whether the transaction created a reasonable opportunity of making a profit from the transaction.  <u>Coltec</u>, 454 F.3d at 1356; <u>Bank of New York</u>, 140 T.C. at34.  The subjective, non-tax business purpose inquiry focuses on whether "the taxpayer's sole subjective motivation is tax avoidance," including whether the transaction is "shaped solely by tax-avoidance features."  <u>Coltec</u>, 454 F.3d at 1355, 1355 n.13 (quoting <u>Frank Lyon Co. v. United States</u>, 435 U.S. 561, 583-84 (1978)).  The transaction

to be analyzed is the one that gave rise to the alleged tax benefit, id. at 1356, "even if it is part of a larger set of transactions or steps," Bank of New York, 140 T.C. at 33 (citing, inter alia, Nicole Rose Corp. v. Comm'r, 320 F.3d 282, 284 (2d Cir. 2002 ). "Stated another way, the requirements of the economic substance doctrine are not avoided simply by coupling a routine transaction with a transaction lacking economic substance. A contrary application would undermine the flexibility and efficacy of the economic substance doctrine." Id. (citation omitted); see also Coltec, 454 F.3d at 1356 (observing that a taxpayer cannot show a non-tax business purpose "simply by showing some factual connection . . . to an otherwise legitimate transaction") (quoting Basic Inc. v. United States, 212 Ct. Cl. 399, 409, 549 F.2d 740 (1977)).

The first step in the economic substance inquiry is to identify the transaction to be analyzed. The Government urges that the Trust and the Loan are economically distinct, and that as a matter of both law and economics, the Court should conduct an analysis of the Trust as a stand-alone transaction. Plaintiff opposes this view, arguing that STARS "must be analyzed as a single, integrated transaction because the so called 'components' . . . were linked by the business and commercial realities of the parties[.]" Pl.'s Br. 217. The Court agrees with the Government that the links between the Trust and Loan components of STARS are artificial, and further, that the disputed foreign tax credits are attributable solely to the Trust. Accordingly, the Court will bifurcate the STARS transaction and examine the Trust structure for economic substance, independent of the Loan. However, the Court also will apply the economic substance analysis through the lens of STARS as an integrated transaction. As demonstrated below, the STARS transaction also lacks economic substance when the Trust and the Loan are examined together.

D. Bifurcated Analysis

1. The STARS Trust Structure

The STARS Trust structure consisted of a number of newly created and one existing special purpose entities. BB&T used the Trust structure to subject its income from assets in the United States to tax in the United Kingdom without otherwise altering that income or its management and control of the assets. BB&T accomplished the U.K. tax effect by circulating the income among the STARS entities, and into and out of a blocked account. The disputed foreign tax credits are entirely attributable to the Trust structure and not to the Loan. The creation of the Trust and the circulation of income were not required to activate a loan from Barclays to BB&T, and the existence of a loan was not required for the STARS Trust to generate the tax credits at issue. In fact, the Court notes that STARS initially was designed to generate the same foreign tax credits without any loan component. In the early iterations of STARS, the Bx payment served simply to enhance the revenue being earned on the Trust assets. Peacock, Tr. 2309.

The STARS Trust consisted of three principal circular cash flows.  A circular cash flow is a set of offsetting cash entries that lack economic importance.  "Courts have consistently recognized that the presence of circular cashflows strongly indicates that a transaction lacks economic substance."  <u>Bank of New York</u>, 140 T.C. at 36; <u>see</u> also <u>Consol. Edison Co. v. United States</u>, 703 F.3d 1367, 1375 (Fed. Cir. 2013) ("[W]e easily concluded that the court was 'left with purely circular transactions that elevate[d] form over substance.'" (quoting <u>Wells Fargo & Co. v. United States</u>, 641 F.3d 1319, 1330 (Fed. Cir. 2011)).  It hardly requires mention that no profit and no risk will occur in a circular cash flow.  Wild, Tr. 2354.[11]

In the first circular cash flow, BB&T caused an entity called DelCo to make monthly distributions to the Trust which the Trust immediately returned to DelCo. Cycling the income from DelCo to the Trust had the effect of subjecting the income to U.K. tax without changing the substance or character of the income.  In the second circular cash flow, BB&T cause the Trust to deposit a predetermined amount into a blocked account, and then to withdraw that amount immediately.  This circular cash flow was necessary to allow Barclays to claim a U.K. tax loss for the purported reinvestment of the 99 percent portion of the Trust's income.  Barclays was nominally entitled to this amount, but the transaction had no economic effect.  In the third circular cash flow, BB&T cycled cash through the U.K. taxing authority, then to Barclays, and then back to itself.  This cash flow also was meaningless from an economic perspective.  The final step in the process was the payment of the Bx.  The Trust structure's primary activity was executing these meaningless monthly transfers, none of which had any economic substance.

The Bx payments under STARS simply represented a rebate to BB&T of one-half of the U.K. taxes to which BB&T voluntarily subjected itself.  The rebates embodied in the Bx payments were directly proportional to the amount of U.K. taxes paid.  The greater the amount of revenue produced by the C Unit distributions of the Trust, the higher the U.K. taxes would be, and the higher the Bx payments would be to BB&T. STARS thus had the counterintuitive result that the greater the amount of foreign taxes paid by the taxpayer, the greater the amount of profit realized from the Bx rebate payments.

In evaluating a transaction for pre-tax profit, a court must determine which aspects are real economic effects and thus non-tax items, and which are tax effects.  See <u>In re CM Holdings, Inc.</u>, 301 F.3d 96, 103 (3d Cir. 2002) ("The main question these different formulations address is a simple one: absent tax benefits, whether the transaction affected the taxpayer's financial position in any way."); <u>see also</u> <u>Coltec</u>, 454 F.3d at 1356 n.16;

---

[11]  When asked if two people could make a profit "if I agree to give you $10 and you agree to give me $10, and we do that repeatedly once a month for five years," Mr. Wild answered "[w]e would not make a profit from doing that."  Wild, Tr. 2534.

<u>Wells Fargo</u>, 91 Fed. Cl. at 82 (collecting cases).  Courts must isolate tax effects and examine the aspects of the transaction that are economically substantive absent the tax. See <u>Frank Lyon Co. v. United States</u>, 435 U.S. 561, 573 (1978) (holding that the objective economic reality controls rather than the form chosen by the parties); <u>BB&T Corp. v. United States</u>, 523 F.3d 461, 471 (4th Cir. 2008) (noting "[a] taxpayer may not . . . claim tax benefits . . . by affixing labels to its transactions that do not accurately reflect their true nature."); <u>Wells Fargo</u>, 91 Fed. Cl. at 75-76.

In the <u>Bank of New York</u> case, the Tax Court referred to the Bx payment as the "spread," holding:

> The spread artificially reduced the loan's cost and lacked economic reality.  In substance the spread was contingent on the parties' anticipated tax treatment and was unrelated to the time value of money or the attendant risks associated with the loan.  We conclude, on the record as a whole, that the spread was in substance not a component of loan interest.  The spread rather was a tax effect.  It was embedded in the loan to serve as a device for monetizing and transferring the value of anticipated foreign tax credits generated from routing income through the STARS structure.

<u>Bank of New York</u>, 140 T.C. at 42-43.  By design of the STARS transaction, the value of BB&T's U.K. tax payment ends up in the hands of Barclays.  Barclays then paid BB&T for subjecting itself to a U.K. tax.  However, the return to BB&T of one-half of its U.K. tax did not constitute profit for BB&T.  The Bx payment simply reimbursed BB&T for one-half of its out-of-pocket U.K. tax costs on the transaction.  The transaction became immensely profitable to BB&T when it claimed U.S. foreign tax credits for a U.K. tax cost that it had not in substance paid.

BB&T's artificial pairing of Barclays' Bx payments (representing in substance a rebate of its U.K. tax payments) with BB&T's interest payments to Barclays, does not reflect economic reality.  The economic nature of the Bx payments simply is a tax effect, and in particular a U.S. tax effect, and not that of a reduction of interest income as BB&T would have the Court view them.

Income from BB&T's pre-existing assets cycled through the STARS Trust was not profit from STARS.  The economic substance inquiry "focuses on whether there was a reasonable possibility of making a profit from the transaction." <u>Stobie Creek</u>, 608 F.3d at 1376-77.  This inquiry focuses on what a reasonably prudent investor would have found from looking at the transaction prospectively.  <u>Id.</u> (citing <u>Gilman v. Comm'r</u>, 933 F.2d 143, 146-47 (2d Cir. 1991)); <u>Fidelity Int'l Currency Advisor A Fund, LLC v. United States</u>, 747 F. Supp. 2d 49, 231-32 (D. Mass. 2010), <i>aff'd</i>, 661 F.3d 667 (1st Cir. 2011).

Applying this test, courts have found that transfers of income-producing assets to controlled entities do not imbue an arrangement with substance if the transfer has no incremental effect on the taxpayer's activities. Gregory, 293 U.S. at 469 (holding that a contribution of assets to a special purpose entity did not imbue a transaction with substance); Southgate Master Fund v. United States, 659 F.3d 466, 491-92 (5th Cir. 2011) (disregarding partnership used to acquire loan receivables); Coltec, 454 F.3d at 1354 (disregarding management benefits that were available without undertaking contributions to a special purpose entity); ACM P'ship v. Comm'r, 157 F.3d 231, 249-52 (3d Cir. 1998) (disregarding returns on Citicorp notes where economic returns on capital were unaffected by the transaction); Zmuda v. Comm'r, 731 F.2d 1417, 1421 (9th Cir. 1984) (disregarding contribution of income-producing assets to foreign trusts); Gerdau Macsteel, Inc. v. Comm'r, 139 T.C. 67, 173-74 (2012) (only incremental cash flows that the taxpayer would not have obtained in the absence of the transaction should be considered in testing whether there is a reasonable expectation of non-tax benefits).

The Court concludes that the STARS Trust must be disregarded as a sham structure. Under both the economic substance and substance-over-form doctrines, the creation and use of sham structures to achieve tax benefits are disregarded for federal tax purposes. Southgate Master Fund, 659 F.3d at 491-92; Schell v. United States, 589 F.3d 1378, 1382 (Fed. Cir. 2009); Fidelity Int'l Currency Advisor, 747 F. Supp. 2d at 233 ("If a partnership is found to be a sham, the partnership should be disregarded, and the partnership's activities are deemed to be engaged in by one or more of the partners."). A sham structure that lacks a non-tax business purpose and is "unreal" or "a bald and mischievous fiction" must also be disregarded. Moline Props., Inc. v. Comm'r, 319 U.S. 436, 439 (1943).

The STARS Trust had no non-tax business purpose. Its sole function was to self-inflict U.S.-sourced BB&T income in order to reap U.S. and U.K. tax benefits. The case law is quite clear that "whether the 'sham' be in the entity or the transaction . . . the absence of a nontax business purpose is fatal." ASA Investerings, 201 F.3d at 512; see also Andantech LLC v. Comm'r, 331 F.3d 972, 978 (D.C. Cir. 2003).

2. The STARS Loan

The STARS Loan lacked economic substance because it was not structured to make a profit, but instead was devised to provide BB&T with a pretext for a purported business purpose for engaging in a sham transaction. The Loan simply was a method by which to camouflage Barclays' rebate of a portion of BB&T's U.K. tax payments, through payment of the Bx. Absent the tax benefits, the cost of the Loan was considerably higher than BB&T's normal cost of borrowing for similar loans. The record supports the conclusion that BB&T chose to terminate the transaction when the tax benefits associated with STARS were threatened. The Loan in reality had no non-tax business purpose and had no possibility of pre-tax profit.

The pre-tax profit test requires an objective analysis from the perspective of a prudent investor of whether there was a reasonable possibility of making a profit from the transaction apart from tax considerations.  Stobie Creek, 608 F.3d at 1376-77.  It is quite true that STARS improved BB&T's bottom line based solely on tax benefits.  However, the Bx payment cannot be considered pre-tax profit on the Loan because it was generated by circular cash flows designed for tax purposes and thus is purely a tax effect of the transaction.

Excluding the Bx payment, the cost of borrowing on the STARS Loan was LIBOR + 25 basis points.  This rate was significantly higher than rates on comparable sources of funds available to BB&T by a magnitude of 30 basis points or more.  Finard, Tr. 5124-25.  BB&T had plenty of less expensive funding resources available during the years in question.  Cragg, Tr. 4621-22; USX 1002.  Absent strong economic reasons, large commercial banks do not engage in financing transactions at rates of 25 to 35 basis points higher than their market sources of funding, particularly as to loans over $1 billion.  BB&T has not demonstrated the presence of such economic reasons.

BB&T argues that its interest rate for the STARS Loan should be compared to its interest rates for long-term funding, but this assertion is incorrect.  The term of the funding, like the pricing, must be considered absent the tax benefits.  The agreement with Barclays was that the Loan rate would be based on a 30-day LIBOR rate, and either party had the right to terminate the transaction within 30 days.  The only reason to continue the Loan for the five-year life of STARS was because of the purported low-cost funding.  However, the low-cost funding was entirely the product of the tax benefit, not because of any economic benefit.  Absent the tax benefits, BB&T would have terminated the transaction immediately, which it in fact did in April 2007 when there was concern that the tax benefits would disappear.

In examining the profitability of the STARS transaction, the Court declines to consider the income from BB&T's use of the Loan proceeds.  Although BB&T surely would use the Loan proceeds to generate revenue, this fact is irrelevant for purposes of the economic substance analysis.  See Schering-Plough Corp. v. United States, 651 F. Supp. 2d 219, 265-67 (D.N.J. 2009) ("[T]he use for which a disputed transaction is put is not relevant in determining whether the transaction itself has sufficient substance."), aff'd sub nom. Merck & Co. v. United States, 652 F.3d 475 (3d Cir. 2011); see also In re CM Holdings, Inc., 254 B.R. 578, 638-39 (D. Del. 2000) ("The Court must focus on the purpose of the underlying transaction at issue here, not what [the taxpayer] intended to do with the proceeds . . . .  What the cash flows derived from this transaction were to be used for is irrelevant for . . . the economic substance analysis."), aff'd, 301 F.3d 96 (3d Cir. 2002); Am. Elec. Power Co., Inc. v. United States, 326 F.3d 737, 744 (6th Cir. 2003) ("Money generated by means of abusive tax deductions can always be applied to beneficial causes, but the eventual use of the money thus generated is not part of the

economic-sham analysis."); <u>Winn-Dixie Stores, Inc. v. Comm'r</u>, 113 T.C. 254, 287 (1999) (rejecting taxpayer's claim that funding employee benefits with tax savings was legitimate non-tax business purpose because "[i]f this were sufficient to breathe substance into a transaction whose only purpose was to reduce taxes, every sham tax-shelter device might succeed."), *aff'd*, 254 F.3d 1313 (11th Cir. 2001).

There is no evidence that BB&T took into account the use of the Loan proceeds in deciding whether to enter the STARS transaction. Under any circumstance, BB&T would have used the Loan proceeds to generate revenue for the bank, regardless of where it obtained the Loan proceeds. The evidence shows that BB&T viewed the Bx payments as its source of profit on the STARS transaction. However, a taxpayer must establish with contemporaneous evidence that it objectively anticipated a profit from the transaction *apart from the tax benefits*. <u>See</u> <u>Goldstein v. Comm'r</u>, 364 F.2d 734, 739 (2d Cir. 1966) (disallowing deductions where taxpayers' contemporaneous evidence failed to establish any anticipated profit potential apart from tax consequences of transactions); <u>ACM P'ship</u>, 157 F.3d at 257 (Colgate's "failure to conduct a contemporaneous profit analysis support[s] the Tax Court's conclusion that ACM's transactions were not designed or reasonably anticipated to yield a pre-tax profit").

Here, the contemporaneous documents show that Barclays, KPMG, and BB&T all considered the profit on STARS to come solely from Barclays' rebate of the U.K. taxes, with BB&T then claiming foreign tax credits for the amount rebated. The Loan proceeds should not be taken into account in a profit calculation because such proceeds would have been available in any alternative funding scenario. Due to the complexity of STARS, BB&T's costs on the STARS Loan are much higher than they would have been on simpler, alternative funding. STARS did not provide BB&T with any incremental economic benefits on the Loan.

### E.  <u>Integrated Transaction Analysis</u>

BB&T contends that the Court should review the STARS transaction as a single integrated agreement, and thereby evaluate the business purpose of STARS with the Trust and the Loan together. BB&T argues that the existence of the Trust permits Barclays to offer BB&T a $1.5 billion loan at very favorable interest rates. Viewed in this way, the STARS transaction simply creates a method in which Barclays and BB&T can use foreign tax credits to provide a sizable loan at 300 basis points below LIBOR.

Case law instructs the Court to consider the economic realities of a transaction instead of the form of agreement that the parties employed. In <u>Frank Lyon Co.</u>, the Supreme Court ruled:

> In applying this doctrine of substance over form, the Court has looked to the *objective economic realities* of a transaction

> rather than to the particular form the parties employed. The Court has never regarded "the simple expedient of drawing up papers" as controlling for tax purposes when the objective economic realities are to the contrary. "In the field of taxation, administrators of the law and the courts are concerned with *substance and realities*, and formal written documents are not rigidly binding."

435 U.S. at 572-73 (emphasis added) (citations omitted) (quoting Comm'r v. Tower, 327 U.S. 280, 291 (1946); Helvering v. Lazarus & Co., 308 U.S. 252, 255 (1938). Similarly, in Coltec, the Federal Circuit observed:

> First, although the taxpayer has an unquestioned right to decrease or avoid his taxes by means which the law permits, Gregory, 293 U.S. at 469, 55 S. Ct. 266, the law does not permit the taxpayer to reap tax benefits from a transaction that lacks *economic reality*.
>
> ***
>
> Third, the economic substance of a transaction must be viewed objectively rather than subjectively. The Supreme Court cases and our predecessor court's cases have repeatedly looked to the *objective economic reality* of the transaction in applying the economic substance doctrine.

454 F.3d at 1355, 1356 (emphasis added). More recently, in Consolidated Edison, involving a LILO transaction, the Federal Circuit similarly stated:

> As we stated in Coltec, judicial anti-abuse doctrines "prevent taxpayers from subverting the legislative purpose of the tax code." One such doctrine is the substance-over-form doctrine. Under this doctrine, courts determine 'the tax consequences of a transaction . . . based on the underlying substance of the transaction rather than its legal form." "The major purpose of the substance-over-form doctrine is to recharacterize transactions in accordance with their *true nature*."

703 F.3d at 1374 (emphasis added) (citations omitted) (quoting Southgate Master Fund, 659 F.3d at 491-92; Wells Fargo, 641 F.3d at 1325; Coltec, 454 F.3d at 1354

Applying these principles here, the STARS transaction must be seen for what it really is. By creating a trust arrangement with nothing but circular cash flows, and momentarily placing funds in the hands of a U.K. trustee before it is returned, Barclays and BB&T artificially caused a U.K. tax on U.S.-sourced revenue. There was no

substantive economic activity occurring in the U.K. to warrant a U.K. tax. Yet, by subjecting the Trust funds to a U.K. tax, Barclays and BB&T were able to share the benefits of foreign tax credits, which resulted in a 51 percent rebate of a Bx payment to BB&T. The surprisingly low interest rate to BB&T on the $1.5 billion Loan, 300 basis points below LIBOR, was made possible solely because of the fruits of the Trust arrangement. In reality, the U.S. Treasury is funding the monetary benefits realized by BB&T, Barclays, and the U.K. Treasury. No aspect of the STARS transaction has any economic reality.

### F. Penalties

"The Federal tax system is primarily one of self-assessment, whereby each taxpayer computes the tax due and then files the appropriate form of return along with the requisite payment." United States v. Galletti, 541 U.S. 114, 122 (2004) (internal quotation marks omitted). When a taxpayer underpays his taxes due to, *inter alia*, negligence or a substantial understatement of tax, the Internal Revenue Code assesses penalties. 26 U.S.C. § 6662. Section 6662 imposes a 20 percent penalty on any portion of an underpayment that is attributable to "[n]egligence or disregard of rules or regulations" or "[a]ny substantial understatement of income tax." § 6662(b)(1-2). These accuracy-related penalties are not cumulative; therefore, the maximum accuracy-related penalty imposed on any portion of an understatement is 20 percent. Treas. Reg. § 1.662-2(c); Alpha I, L.P. v. United States, 93 Fed. Cl. 280, 301 (2010). As will be discussed below, § 6664(c)(1) provides an absolute defense to accuracy-related penalties assessed for an underpayment "if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion."

The Government asserts that BB&T is subject to penalties for negligence and substantial understatement of income tax. Plaintiff asserts the defenses of substantial authority, reasonable reliance on tax professionals, adequate disclosure, and reasonable cause and good faith.

### 1. Negligence

Section 6662 imposes an accuracy-related penalty of 20 percent for any portion of the underpayment which is attributable to "[n]egligence or disregard of rules or regulations." § 6662(b). For purposes of this penalty, "the term 'negligence' includes any failure to make a reasonable attempt to comply with the provisions of this title, and the term 'disregard' includes any careless, reckless, or intentional disregard" of tax rules and regulations. § 6662(c). "Negligence is strongly indicated where . . . [a] taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances." Treas. Reg. § 1.6662-3(b)(1)(ii). "[W]hen a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax

obligations, he should recognize that he proceeds at his own peril." Alpha I, 93 Fed. Cl. at 302 (quoting Neonatology Assocs., P.A. v. Comm'r, 299 F.3d 221, 234 (3d Cir. 2002)) (internal quotation marks omitted).

A taxpayer is not negligent when there is a reasonable basis for the position taken. Treas. Reg. § 1.6662-3(b)(1). The reasonable basis standard is relatively high, and "is not satisfied by a return position that is merely arguable or that is merely a colorable claim." Id. at § 1.6662-3(b)(3). Good faith reliance on professional advice may provide a reasonable basis, but such reliance "must be objectively reasonable; taxpayers may not rely on someone with an inherent conflict of interest . . . ." Stobie Creek, 82 Fed. Cl. at 709 (quoting Chamberlain v. Comm'r, 66 F.3d 729, 732 (5th Cir. 1995)). Thus, "the defense of reliance on professional advice prevails only if, under all the circumstances, (1) the advice itself is reasonable . . . and (2) the taxpayer's reliance thereon is reasonable." Stobie Creek, 82 Fed. Cl. at 712.

### a.   Reasonableness of the advice

In determining whether the professional advice itself was reasonable, courts look to whether the advice is based on accurate information and representations supplied by the taxpayer, whether there was a reasonable investigation into the transaction, and whether it contains any unreasonable or unsupported assumptions. Id. Here, KPMG was the principal marketer of STARS, and provided BB&T with advice as to the viability and profitability of the transaction. As discussions between KMPG and BB&T progressed, BB&T became concerned that if challenged, the IRS may determine that STARS lacked economic substance. KPMG advised BB&T that the possibility of a court finding BB&T to have engaged in a sham transaction was "so remote as to not need to be considered." USX 564. KPMG further advised that even if STARS was found to lack economic substance, BB&T would nevertheless be allowed a deduction for the U.K. taxes. Monger, Tr. 1253-55. The Court finds this assertion (and BB&T's reliance thereon) to be unreasonable and unsupported. KPMG's assumption that BB&T could claim a deduction for U.K. taxes even if STARS was found to lack economic substance flies in the face of the accepted principle that a transaction lacking in economic substance is disregarded for tax purposes. See, e.g., Coltec, 454 F.3d at 1355. KPMG's overarching advice was that BB&T should engage in an economically meaningless transaction to achieve foreign tax credits for taxes BB&T had not in substance paid. Thus, because KPMG's advice was based on unreasonable and unsupported assumptions, the Court finds KPMG's advice unreasonable.

Based on KPMG's recommendation, BB&T also selected the law firm of Sidley Austin, and in particular, Raymond J. Ruble, to provide tax advice and a formal opinion on STARS. BB&T did not formerly engage Sidley Austin until May 7, 2002. JX 264. However, on April 30, 2002, Mr. Ruble forwarded to BB&T a redacted tax opinion endorsing the STARS transaction, which had been prepared for another client. USX 599;

Monger, Tr. 927.  This tax opinion detailed a very similar STARS transaction, with the exact same entity names, such as InvestCo, Manager, NewCo, and DelCo.  USX 599; Monger, Tr. 927-28.  Although the final BB&T STARS tax opinion was tailored in part to BB&T specifically, a review of Mr. Ruble's other legal tax opinions on the STARS transaction reveals that his favorable opinions were largely pre-fabricated and pre-determined.  Compare PX 174 with USX 1502 and USX 464.  Similar to the advice of KPMG, Sidley Austin's advice and opinion letters endorsed and advocated the promulgation of economically meaningless transactions.  Because Sidley Austin's tax opinion was premised on the unreasonable and unsupported assumption that technical compliance with U.S. tax law would allow the IRS to give its imprimatur to an economically meaningless transaction, the Court finds Sidley Austin's advice unreasonable.

### b.  Reasonableness of the reliance

In determining whether a taxpayer's reliance on professional advice was reasonable, courts evaluate any potential conflict of interest, the taxpayer's knowledge and expertise, and whether the transaction seems "too good to be true."  See, e.g., Stobie Creek, 82 Fed. Cl. at 712; Neonatology, 299 F.3d at 233-34.  As mentioned above, KPMG was the principal promoter of STARS to BB&T.  KPMG marketed the STARS transaction to BB&T, and would not receive any of its $6.5 million fee unless and until BB&T closed on the STARS transaction.  Prior to the closing date of STARS, BB&T knew that KPMG was involved in the design of the STARS structure and that KPMG reviewed Barclays' design of the STARS transaction.  Monger, Tr. 614-19.  BB&T also was aware that KPMG was "on both sides" of the transaction between Barclays and BB&T, and that KPMG thus had a blatant conflict of interest.  PX 67.  Indeed, the head of KPMG's Department of Professional Practice for tax matters expressed concern about KPMG's ability to issue a "should-level" opinion.  DeLap Dep., 62-67, 75-76; USX 241; USX 243.  Despite knowing that KPMG had prior involvement with the STARS transaction, BB&T did not seek an independent tax opinion.  Watson, Tr. 2845.[12]

Similarly, at the time BB&T received Sidley Austin's tax opinion and subsequently retained the law firm (on KPMG's recommendation), BB&T was aware that Sidley Austin was a co-developer of STARS and that it had previously provided a favorable tax opinion of STARS to another bank.  Monger, Tr. 615-16; JX 255.  Thus, both KPMG and Sidley Austin stood to profit considerably from BB&T's adoption of the transaction, and BB&T knew or should have known that their advice would not be impartial and independent.  In agreeing to Sidley Austin's engagement letter, BB&T was

---

[12]  The Court finds it remarkable that BB&T would retain KPMG for $6.5 million in fees for tax advisory services, given KPMG's conflict of interest in also promoting STARS on behalf of Barclays, and receiving fees from Barclays upon the closing of each new STARS transaction.  See, e.g., USX 278 at 4 ("STARS is a joint venture between KPMG and Barclays.")

asked to waive any conflicts that Sidley Austin had with Barclays, but BB&T did not even inquire about the services that Sidley Austin was or had been performing for Barclays.  Monger, Tr. 1297-99.  As the Third Circuit stated in Neonatology:

> It may well be that reliance on the advice of a professional should only be a defense when the professional's fees are not dependent on his opinion.  For example, it is not immediately evident why a taxpayer should be able to take comfort in the advice of a professional promoting a tax shelter for a fee.  After all, that professional would have an interest in his opinion.

299 F.3d at 234 n.22.  Because both KPMG and Sidley Austin[13] had a significant interest in convincing BB&T to engage in the STARS transaction, the Court cannot say that BB&T acted reasonably in relying on their advice.  See Alpha I, 93 Fed. Cl. at 316 ("It is well established that taxpayers generally cannot reasonably rely on the professional advice of a tax shelter promoter." (quoting Edwards v. Comm'r, 84 T.C.M. (CCH) 24 (2002)); Pasternak v. Comm'r, 990 F.2d 893, 903 (6th Cir. 1993) (upholding negligence penalty where "the purported experts were either the promoters themselves or agents of the promoters.  Advice of such persons can hardly be described as that of 'independent professionals.'")).  Here, Sidley Austin sent BB&T a favorable draft opinion letter about STARS before BB&T had even engaged this law firm.  Monger, Tr. 1265-67.

BB&T's engagement with PwC is insufficient to remove the taint of unreasonableness from the professional tax advice relied upon.  PwC's involvement in the STARS transaction does not create a reasonable basis for BB&T's tax position because: (1) BB&T reported only Barclays, KPMG, and Sidley Austin as its tax advisors to the STARS transaction, JX 234; (2) PwC explicitly informed BB&T that it "in no way [was] providing an Opinion" regarding STARS, JX 259; and (3) PwC's audit advice was informed by the unreasonable and unsupported representations made by KPMG and Sidley Austin, Boss, Tr. 2042-46; USX 568; JX 859.  Moreover, PwC ultimately arrived at a "less than should" level of comfort that the IRS would accept the STARS transaction.  Boss, Tr. 2098, 2117-18; USX 951A at 7183-84; USX 553, 601, 611.  During exceptional cross-examination by Defendant's counsel, PwC's Mr. Boss was evasive and had few answers for the glaring weaknesses that PwC should have seen in the STARS transaction.  Boss, Tr. 2131-41.

---

[13] Mr. Ruble's incentive to issue favorable STARS tax opinions is further highlighted in his 2001 internal memorandum regarding his law firm compensation package.  USX 85 at 4.  In this memorandum, Mr. Ruble stated "I intend to continue to exploit ties with KPMG . . . in connection with the development of structured tax products."  Id.  He further noted that "the success of this practice is highly dependent upon the absence of anti-shelter legislation and similar IRS positions."  Id.

Additionally, the BB&T executives that reviewed the economic and tax effects of the STARS transaction are highly educated and well-versed in banking transactions and financing deals.  These individuals knew or should have known that claiming nearly $500 million in foreign tax credits by subjecting income to economically meaningless activities was "too good to be true."  Indeed, the evidence shows that BB&T executives were extremely skeptical of the tax benefits of STARS, as the potential downside tax risks were the subject of much correspondence and presentation.  Monger, Tr. 1102-04, 1126-37; Watson, Tr. 3466-69.  Moreover, Mr. Monger generated many spreadsheet analyses calculating BB&T's potential economic return on STARS in the event that the IRS disallowed the foreign tax credits.  USX 437.

BB&T's concern over the tax risk was significantly reflected in the negotiations and eventual fee arrangement with KPMG.  In a meeting with KPMG, BB&T representatives expressed a "concern[] that KPMG needs to have some of the fee at risk[]" and a desire to "reduce [BB&T's] exposure in the event of an early termination of the transaction."  Monger, Tr. 1156-57; USX 470.  BB&T negotiated that KPMG would provide audit assistance if the IRS challenged the transaction.  JX 254.  This skepticism on the part of BB&T was well-founded, because as a successful financial holding company with banking subsidiaries in over twelve states, JX 209, it surely would have recognized that the ability to claim nearly $500 million in foreign tax credits merely by subjecting its assets to U.K. taxation was too good to be true.  See Neonatology, 299 F.3d at 234 ("When, as here, a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril.").

Thus, the fact that BB&T relied on the advice of promoters of the STARS tax shelter despite having ample capacity to recognize that the transaction was "too good to be true," thoroughly vitiates any reasonable basis for BB&T's tax position.  Accordingly, Plaintiff is liable for the 20 percent negligence penalty, unless it can establish reasonable cause and good faith, a defense addressed below.

## 2.  Substantial Understatement

Under § 6662, an understatement is substantial if it exceeds the lesser of 10 percent of the tax required to be shown on the return for the taxable year or $10,000,000.[14]  § 6662(d)(1)(B).  The amount of any understatement can be reduced for any portion as to which the taxpayer can either establish substantial authority for the position the taxpayer took or demonstrate a reasonable basis for the claimed tax treatment, coupled with adequate disclosure.  § 6662(d)(2)(B).  For the tax years at issue,

---

[14] Section 6662 was amended in 2004.  For the years 2002 and 2003, an understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $10,000.

these defenses are modified when a tax shelter is involved.  See, e.g., § 6662(d)(2)(C); Stobie Creek, 82 Fed. Cl. at 705.[15]

To avoid the penalty in the case of a corporate tax shelter, the taxpayer must establish (1) that there was substantial authority for the tax treatment and (2) that the taxpayer reasonably believed that the reported treatment of an item was more likely than not the proper treatment.  Treas. Reg. § 1.6662-4(g)(1); see also § 6662(d)(2)(C)(i); Alpha I, 93 Fed. Cl. at 321.[16]  The substantial authority standard is an objective standard, which is met only if the "weight of the authorities supporting the treatment is substantial in relation to the weight of the authorities supporting contrary treatment."  Treas. Reg. § 1.6662-4(d)(3)(i).   The weight given to each authority depends on its relevance, persuasiveness, and source.  Id. § 1.6662-4(d)(3)(ii).  "Conclusions reached in treaties, legal periodicals, legal opinions, or opinions rendered by tax professionals are not authority."  Id. at § 1.6662-4(d)(3)(iii); Alpha I, 93 Fed. Cl. at 322 ("Reliance on advice by tax professionals is specifically excluded in deciding whether substantial authority exists for a particular tax treatment.").  When a transaction is found to lack economic substance, no authority, much less substantial authority, supports the claimed tax treatment.  Stobie Creek, 82 Fed. Cl. at 706, 706 n.64, (finding that transactions lacked economic substance precluded plaintiffs from establishing existence of substantial authority to support tax treatment).

As discussed in detail above, the STARS transaction lacked economic reality because it was unsupported by a tax-independent business purpose.  Thus, because the transaction's significant purpose was "the avoidance or evasion or Federal income tax," STARS falls within the statutory definition of a "tax shelter."  § 6662(d)(2)(C)(iii).  Not only was the STARS transaction a tax shelter, but it was also an economically meaningless transaction.  The STARS transaction was no more than a circular redirection of cash flows from the U.S. Treasury to BB&T, Barclays, and the U.K. Treasury.  The Court's determination that STARS lacked economic substance precludes Plaintiff from establishing the first prong of its defense, as there is no authority, much less substantial, that supports "a subterfuge for generating, monetizing and transferring the value of foreign tax credits . . . ."  Bank of New York, 140 T.C. at 31; see Stobie Creek, 82 Fed. Cl. at 706 n.64 ("[N]o substantial authority exists to support recognition of tax results that are premised on transactions with no appreciable business purpose beyond conferring tax benefits."); Long Term Capital Holdings v. United States, 330 F. Supp. 2d 122, 204-05 (D. Conn. 2004) (holding that taxpayer cannot cite authority to support tax treatment once transaction is deemed to lack economic substance).  Because the Court finds that

---

[15] The 2004 amendment completely eliminated any reduction under § 6662(d)(2)(B) in the case of tax shelters.  See American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 812(d), 118 Stat. 1418, 1577-81.

[16] Thus, in the situation of a tax shelter, the defenses of adequate disclosure or substantial authority (standing alone), are insufficient to avoid the imposition of penalties.

substantial authority does not support the tax treatment claimed by BB&T, the Court need not address whether BB&T reasonably believed that the tax treatment claimed was more likely than not the proper treatment.  Plaintiff is liable for the 20 percent substantial understatement penalty.  Whether the reasonable cause and good faith exception provides BB&T with a valid defense to the substantial understatement penalty is addressed below.

### 3.  Reasonable Cause and Good Faith

Section 6664(c)(1) provides an absolute defense to the imposition of any accuracy-related penalty:

> No penalty shall be imposed under section 6662 or 6663 with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion.

The taxpayer bears the burden of showing that this exception applies.  Stobie Creek Invs. LLC v. United States, 608 F.3d 1366, 1381 (Fed. Cir. 2010) (citing Conway v. United States, 326 F.3d 1268, 1278 (Fed. Cir. 2003)).  Reliance on professional advice may constitute reasonable cause and good faith "if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith."  Treas. Reg. § 1.6664-4(b)(1).  In determining whether a taxpayer has reasonably relied in good faith on advice as to the tax treatment, all facts and circumstances must be taken into account, including but not limited to "the taxpayer's education, sophistication, and business experience[.]"  Id. at § 1.6664-4(c)(1).  Additionally, the advice "must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances[,]" "must not be based on unreasonable factual or legal assumptions (including assumptions as to future events)[,]" and "must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person."  Id.  The satisfaction of these requirements will not necessarily establish that the taxpayer reasonably relied on the advice in good faith.  Id.  Reliance is not reasonable, for example, if the adviser has an inherent conflict of interest about which the taxpayer knew or should have known, or if the taxpayer knew or should have known that the transaction was "too good to be true."  Stobie Creek, 608 F.3d at 1382-83 (citing, *inter alia*, Treas. Reg. § 1.6664-4(c)).

As discussed above, the unsupportable assumptions upon which the promoters' advice was based, the conflicts of interest of the STARS promoters, and the BB&T's executives' high level of knowledge and expertise preclude a finding of reasonable reliance on professional advice.  Similarly, the weight of the evidence shows that tax avoidance was singularly and precisely the goal pursued in execution of the STARS transaction.  Consequently, the Court finds that BB&T did not act with reasonable cause and good faith with regard to any portion of the underpayment determined.

For the foregoing reasons, the Court finds that Plaintiff was engaged in an economically meaningless tax shelter, that the negligence accuracy-related penalty of § 6662(b)(1) and the substantial understatement accuracy-related penalty of § 6662(b)(2) apply, and that the defenses of reasonable basis, substantial authority, and reasonable cause and good faith are not available to Plaintiff.

III.   Conclusion

The Court finds in favor of Defendant on all grounds.  Plaintiff's claims for tax refund are DENIED in their entirety.  Before entering final judgment, the Court will conduct a conference with counsel of record on a mutually agreeable date to confirm the proper amount and terms of the judgment.  Pursuant to Rule 54(d), the Court awards costs to Defendant as the prevailing party.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge